SCIENCE ACCESSORIES CORPORA-
TION, Plaintiff, Appellant,

v.

SUMMAGRAPHICS CORPORATION, a Delaware Corporation, Albert Whetstone, Edward Snyder and Stanley Phillips, Defendants, Appellees.

Albert WHETSTONE, Defendant,
Appellee/Cross-Appellant,

v.

SCIENCE ACCESSORIES
CORPORATION, Plaintiff,
Appellant/Cross-Appellee.

Supreme Court of Delaware.

Submitted April 16, 1980.
Decided Nov. 21, 1980.

Bruce M. Stargatt (argued), Jack B. Jacobs, Richard A. Levine of Young, Conaway, Stargatt & Taylor, Wilmington, for plaintiff, appellant/cross appellee, Science Accessories Corp.

F. L. Peter Stone (argued), of Connolly, Bove & Lodge, Wilmington, for defendants, appellees/cross appellant.

Before DUFFY, McNEILLY and HORSEY, JJ.

HORSEY, Justice:

This appeal concerns a corporate employer's claim for equitable relief against former employees for alleged breach of fiduciary and contractual duties with respect to an alleged corporate opportunity.

Science Accessories Corporation (SAC), plaintiff, appeals the Court of Chancery's grant of judgment following trial to defendants Albert Whetstone, Edward Snyder and Stanley Phillips, SAC's former employees, and Summagraphics Corporation, a Delaware corporation.[1] Whetstone cross-appeals the assessment of costs against him.

## I

The litigation arose when Whetstone, Snyder and Phillips quit SAC to develop and market, in the computergraphics[2] field, a new product known as a magnetostrictive or "magwire" digitizer[3] in competition with SAC. To accomplish this, Summagraphics Corporation was formed by a group consisting of defendants, American Research and Development and Dr. Alfred Brenner, who had conceived the new product. Dr. Brenner was not employed by or associated with SAC.

SAC was also then engaged in the business of manufacturing and selling high technology instruments for use in the computergraphics field. SAC's principal product was a digitizer known as a "grafpen", which operated on sonic wave principles and utilized a "spark" to generate and measure sound waves.

Brenner's magwire digitizer concept accomplished the same purpose as the grafpen but by a significantly different technique—by sending a magnetic impulse through magnostrictive wire within the data tablet and measuring the time duration for the impulse to travel the given distance. The magwire digitizer is conceded to be superior to the grafpen in terms of operational reliability and less costly to manufacture.

The theory of SAC's case against Whetstone, Snyder and Phillips at time of trial[4] was that, while serving as key employees[5]

1. Judgments entered as to defendants Dr. Alfred Brenner and American Research and Development have not been appealed.

2. Computergraphics involves the use of computers to solve problems in the field of graphics, including cartography and architecture.

3. A digitizer, or data tablet, is a precision electronic device used in the field of computergraphics to measure distances between given points on a tablet. The digitizer takes data from photographs, maps and drawings, etc. and transmits such information to a computer.

4. The Court had previously dismissed with prejudice SAC's original claim against defendants for breach of fiduciary duty which had been based on charges of alleged theft of SAC's trade secrets, misuse of its customer lists and trade libel. The complaint was then amended to assert a claim against defendants based on a "corporate opportunity" theory for recovery. Later, the complaint was further amended to claim that Whetstone's work on the "breadboard" model conferred on him inventor status as to Brenner's concept. SAC's several applications for interim injunctive relief under its several liability theories had been denied by the Court for lack of a showing of probability of success at trial.

5. Whetstone, a nuclear physicist, was in charge of SAC's research and development and engineering departments. Snyder was SAC's chief engineer and Phillips was supervisor of manufacturing. None of defendants were officers or directors of SAC at the time of the alleged wrongdoing.

of SAC, they had: learned of Brenner's magwire concept, secreted the information from SAC, converted the concept into a "breadboard" or working model, and then diverted the concept from SAC to Summagraphics in breach of their duties to SAC, both fiduciary and contractual.

The basis of defendants' alleged breach of contractual duties to SAC was a technology disclosure agreement which each of them had signed as an employee of SAC and which, in pertinent part, provided:

Any invention or discovery which I may make or conceive, either alone or jointly with others, while employed by the Company, for any improvement in process, machine, manufacture or composition of matter, which relates to the Company's business and fields of endeavor as hereinafter defined, shall be the property of the Company, whether patentable or not and whether made or conceived during regular business hours or otherwise. I will fully and promptly disclose to the Company . . . all information known to me concerning such improvement.

SAC's contention before the Trial Court was that Whetstone, by constructing a "breadboard" or working model of Brenner's magwire concept, obtained inventor rights to the concept; and that by virtue of such status, his agreement with SAC (a) required Whetstone to disclose the concept to SAC; and (b) granted SAC a property interest in the invention.

SAC's remaining claims at time of trial were based on alleged breach of fiduciary duties and/or alleged diversion of a corporate opportunity, with its arguments as to breach of fiduciary duty apparently subsumed within the corporate opportunity thesis.

The Court of Chancery characterized SAC's claims against defendants as, in essence, for "alleged wrongful misappropriation from SAC of a valuable corporate opportunity to develop and market a new magnetostrictive digitizer." As stated, liability was premised on either breach of fiduciary duty or a contractual duty owed to SAC—breaches that SAC contended were of such seriousness as to justify the grant of equitable relief, including an accounting and imposition of a constructive trust.

Following a lengthy trial, the Court found that: (1) the magwire digitizer concept was the sole invention of Dr. Brenner and thus defendants were not co-inventors and had no property interest therein; (2) defendants had not deprived SAC of a corporate opportunity to develop and market Brenner's concept because (a) Brenner was unwilling to have his concept either disclosed to or used by SAC and (b) SAC was not then financially interested in or able to develop and market Brenner's concept; and (3) defendants had not breached any fiduciary or contractual duties owed SAC that would justify equitable relief. The Court dismissed SAC's claim for damages for failure of SAC at trial to introduce any evidence to support a monetary award and granted judgment for all defendants.

SAC does not appeal the Court's dismissal of its damage claim, nor does it appeal the Court's ruling that Brenner's magwire concept was not a corporate opportunity available to SAC. And, SAC does not claim any property interest in the magwire digitizer concept. Nevertheless, SAC contends that the Court erred as a matter of law in ruling that defendants had not committed a breach of fiduciary and contractual duties to SAC justifying equitable relief.

Though abandoning its corporate opportunity thesis, SAC claims that defendants' conduct was in breach of three "independent" fiduciary duties defendants owed SAC under agency law principles. Defendants' claimed fiduciary breaches are:

(1) a duty to disclose Brenner's magwire digitizer concept to SAC even though it had been revealed to Whetstone in confidence and subject to an agreement not to disclose it to SAC. Specifically, SAC argues that Whetstone's agency duty to disclose the invention to SAC overrode his agreement of confidentiality with Brenner;

(2) a duty not to compete with or act adversely to SAC's interest by diverting the

digitizer concept from SAC to themselves through Summagraphics. Here, SAC particularly contests the Trial Court's conclusion that Brenner's concept would have been "useless" to SAC as erroneous, factually as well as legally; and

(3) a duty not to engage in "illegal, immoral and bad faith" behavior while making preparations to leave SAC's employ.

As to its breach of contract claim, SAC contends that its technology agreement with defendants must be construed as requiring defendants to disclose and make available to SAC Brenner's magwire concept by reason of defendants having "made" a working model of the concept while employees of SAC—a contention arguably not made and ruled on below.[6]

Thus, the underlying issue on appeal is whether the Trial Court erred as a matter of law in ruling that defendants had not breached any fiduciary or contractual duty owed SAC as to a business opportunity which was found not to have been available to SAC. We take up first appellant's contentions that a fiduciary breach of duty was established under the law of agency.

## II

The thrust of SAC's fiduciary breach of duty argument is that the Trial Court's conceded finding—that Brenner's concept was not an opportunity available to SAC but one that defendants could take for themselves—is not determinative of SAC's right to equitable relief by reason of defendants' breach of so-called "independent" fiduciary duties owed SAC.

■ It is true, of course, that under elemental principles of agency law, an agent owes his principal a duty of good faith, loyalty and fair dealing. 3 CJS Agency § 271; *Restatement (Second) of Agency* § 387 (1957). Encompassed within such general duties of an agent is a duty to disclose information that is relevant to the affairs of the agency entrusted to him.

There is also a corollary duty of an agent not to put himself in a position antagonistic to his principal concerning the subject matter of his agency. *Restatement (Second) of Agency* §§ 381 and 393 (1957).

■ However, agency law is not without its limitations as to both duty to disclose and duty not to act adversely to a principal's business. Thus, an agent is not under a duty to disclose to his principal information obtained in confidence, the disclosure of which would be a breach of duty to a third person. *Restatement (Second) of Agency* § 381, Comment e (1957); *see also* § 393, Comment c (1957).

■ Similarly, while an agent may not put himself in a position antagonistic to his principal, an agent is not thereby prevented from acting in good faith outside his employment even though it may adversely affect his principal's business. *Restatement (Second) of Agency* § 387, Comment b (1957). Further, an agent can make arrangements or plans to go into competition with his principal before terminating his agency, provided no unfair acts are committed or injury done his principal. *Restatement (Second) of Agency* § 303, Comment e (1957).

■ These principles and limitations of agency law carry over into the field of corporate employment so as to apply not only to officers and directors but also to key managerial personnel. *See Cahall v. Lofland*, Del.Ch., 114 A. 224 (1921); 3 *Fletcher, Cyclopedia Corporations* (Perm.Ed.1975) § 846. They reflect competing policy interests in the law as to employer-employee relationships. On the one hand there is "... concern for the integrity of the employment relationship [which] has led courts to establish a rule that demands of a corporate officer or employee an undivided and unselfish loyalty to the corporation." *Maryland Metals, Inc. v. Metzner*, Md.App., 382 A.2d 564, 568 (1978), citing *Guth v. Loft, Inc.*, Del.Supr., 5 A.2d 503 (1939).

---

**6.** Defendants contend that this construction of the agreement was not fairly presented below as an alternative to SAC's primary contention

that defendants were co-inventors of the magwire digitizer.

However, there is an off-setting policy "recognized by the courts ... of safeguarding society's interest in fostering free and vigorous competition in the economics sphere ... This policy in favor of free competition has prompted the recognition of a privilege in favor of employees which enables them to prepare or make arrangements to compete with their employers prior to leaving the employ of their prospective rivals without fear of incurring liability for breach of their fiduciary duty of loyalty." *Maryland Metals, Inc. v. Metzner, supra,* at 569.

### A

The doctrine of corporate opportunity represents one aspect of the law's effort to reconcile these competing policy interests. *Guth v. Loft, Inc., supra.* 3 *Fletcher, Cyclopedia Corporations* (Perm.Ed.1975) § 861.1. *See General Automotive Manufacturing Company v. Singer,* Wis.Supr., 120 N.W.2d 659, 663 (1963) stating, "The doctrine of corporate opportunity is a species of the duty of a fiduciary to act with undivided loyalty." Thus, the law of corporate opportunity is clearly pertinent, if not decisive, to the issue of whether defendants breached any fiduciary duty owed SAC in their handling of the magwire digitizer concept while in SAC's employ. And SAC so argued below.

■ Briefly summarized, the law is that if a business opportunity is presented to a corporate executive, the officer cannot seize the opportunity for himself if: (a) the corporation is financially able to undertake it; (b) it is within the corporation's line of business; (c) the corporation is interested in the opportunity. *Guth v. Loft, Inc., supra,* and *Johnston v. Greene,* Del.Supr., 121 A.2d 919 (1956). However, as stated in *Equity Corporation v. Milton,* Del.Supr., 221 A.2d 494 at 497 (1966):

A corollary of the *Guth* rule is that when a business opportunity comes to a corporate officer, which, because of the nature of the opportunity, is not one which is essential or desirable for his corporation to embrace, being an opportunity in which it has no actual or expectant interest, the officer is entitled to treat the business opportunity as his own and the corporation has no interest in it, provided the officer has not wrongfully embarked the corporation's resources in order to acquire the business opportunity.

■ Whether the *Guth* rule or its corollary applies depends, of course, on the facts and the reasonable inferences to be drawn therefrom. *Johnston v. Greene, supra; Equity Corporation v. Milton, supra.* Here, the uncontradicted findings of the Court below were: that Brenner was unwilling to permit his concept to be either disclosed to or used by SAC; and that SAC was "neither inclined nor able to develop new products" in the digitizer field by reason of its poor financial condition and its evident unwillingness during the period in question "to develop products suggested by Whetstone." Those findings are clearly sufficient to support the Trial Court's conclusion that Brenner's concept was not an opportunity available to SAC but one that defendants could legally embrace as their own; and SAC does not claim otherwise. *Cf. Kaplan v. Fenton,* Del.Supr., 278 A.2d 834 (1971); *Johnston v. Greene, supra; Katz Corp. v. T. H. Canty & Company, Inc.,* Conn.Supr., 362 A.2d 975 (1975); *Bisbee v. Midland Linseed Products Co.,* 8th Cir., 19 F.2d 24 (1927); 3 *Fletcher, Cyclopedia Corporations* (Perm.Ed.1975) § 862.1.

■ The question then becomes whether the Court's finding that Brenner's concept was not a corporate opportunity available to SAC ends the inquiry as to whether defendants fulfilled their fiduciary duty to SAC of disclosure and not to divert an opportunity to themselves. We think so, for this reason. The gist of SAC's claim that defendants had breached their fiduciary duty to SAC was that the breach occurred as a result of the defendants' acts of secreting and then diverting Brenner's magwire concept from SAC to themselves. That raised a clear corporate opportunity issue which the Trial Court found to be the dominant issue before it at time of trial. With that issue having been resolved by the

Court against SAC based on express findings of fact that are not directly contested,[7] SAC cannot now persuasively argue that the Trial Court's findings as to corporate opportunity are not also dispositive of the question of whether defendants breached their above-mentioned fiduciary duties to SAC. For the law of corporate opportunity sets the parameters of permissible employee conduct consistent with an employee's fiduciary duties to his employers of loyalty and fair dealing.

■ Since Brenner's concept was found to be an "outside" opportunity not available to SAC, defendants' failure to disclose the concept to SAC and their taking it to themselves for purposes of competing with SAC cannot be found to be in breach of any agency fiduciary duty. Further, defendants cannot be said to have diverted anything from SAC once it was determined that SAC had no prior interest or expectancy in Brenner's concept. Hence, the Court's ruling that Brenner's concept was not an opportunity available to SAC but one that defendants could lawfully appropriate to themselves relieved defendants of any agency duty that would otherwise exist to disclose the concept to SAC and not to divert the concept from SAC to themselves.

The clear holdings of this Court as to a claim of corporate opportunity from *Guth* to *Kaplan* are that the determination of the question finally determines the right of the corporate officer "to treat the opportunity as his own." Chief Justice Wolcott of this Court so stated in *Kaplan*:

> By reason of the *Guth* case, if a business opportunity comes to a corporate director in his individual capacity, and if the opportunity is not essential to his corporation and in which his corporation has no interest, and if the corporate resources have not been wrongfully embarked therein, the corporate director is free to treat the opportunity as his own. (citing *Guth v. Loft*, Del.Supr., 5 A.2d 503 (1939)), 278 A.2d at 836.

■ Thus, the doctrine of corporate opportunity is but application of agency fiduciary law in a particular corporate fact setting. As stated in *Guth v. Loft, supra*,

> The rule, referred to briefly as the rule of corporate opportunity, is merely one of the manifestations of the general rule that demands of an officer or director the utmost good faith in his relation to the corporation which he represents. 5 A.2d at 510.

No case authority has been cited by appellant to support the proposition that key corporate personnel are under a duty to disclose to their employer and not divert from him a business proposition that has been found *not* to be available and essential to the corporation. Appellant's reliance upon *Cahall v. Lofland*, Del.Ch., 114 A. 224 (1921) and *Phillips v. Willis*, Del.Ch., 63 A.2d 171 (1949) is misplaced. In each case, the employee was found to have acquired property that belonged to his employer rather than to a third party outsider. Both cases involved misappropriations from within the employer's sphere of control. *Daniel Orifice Fitting Company v. Whalen*, Cal. App., 18 Cal.Rptr. 659 (1962) is also similarly distinguishable as involving an employee's misuse of his employer's trade secrets coupled with the employee's diversion of the results of his work product for his employer to his own personal use.

## B

SAC next contends that the Court committed legal error in ruling that defendants committed no actionable breaches of fiduciary duty in their conduct preparatory to leaving SAC's employ to compete with it. The dispute is not as to the law but its application to the facts. The law is well-stated in *Maryland Metals, Inc. v. Metzner, supra*.

> [The] policy in favor of free competition has prompted the recognition of a privilege in favor of employees which enables

---

**7.** While SAC does not appeal the Court's ultimate finding rejecting SAC's corporate opportunity thesis, SAC indirectly contests it by arguing that the Court's subordinate finding of the concept to have been "useless" to SAC was factually and legally unsupportable.

them to prepare or make arrangements to compete with their employers prior to leaving the employ of their prospective rivals without fear of incurring liability for breach of their fiduciary duty of loyalty. (Citations omitted)

\* \* \* \* \* \*

The right to make arrangements to compete is by no means absolute and the exercise of the privilege may, in appropriate circumstances, rise to the level of a breach of an employee's fiduciary duty of loyalty. Thus, the privilege has not been applied to immunize employees from liability where the employee has committed some fraudulent, unfair or wrongful act in the course of preparing to compete in the future. *Robb v. Green*, [1895] 2 Q.B. 1, 15, aff'd, [1895] 2 Q.B. 315. Examples of misconduct which will defeat the privilege are: misappropriation of trade secrets, *Space Aero v. Darling*, 238 Md. 93, 117, 208 A.2d 74, cert. denied, 382 U.S. 843, 86 S.Ct. 77, 15 L.Ed.2d 83 (1965); misuse of confidential information, *C–E–I–R, Inc. v. Computer Corp.*, 229 Md. at 368, 183 A.2d 374; solicitation of employer's customers prior to cessation of employment, *Ritterpusch v. Lithographic Plate*, 208 Md. at 602, 119 A.2d 392; conspiracy to bring about mass resignation of employer's key employees, *Duane Jones Co. v. Burke*, 306 N.Y. 172, 117 N.E.2d 237, 245 (1954); usurpation of employer's business opportunity, *Raines v. Toney*, 228 Ark. 1170, 313 S.W.2d 802, 809–810 (1958). *See generally* Comment, 22 U.Chi.L.Rev. 278, 282–83 (1954).

Within these broad principles, the ultimate determination of whether an employee has breached his fiduciary duties to his employer by preparing to engage in a competing enterprise must be grounded upon a thoroughgoing examination of the facts and circumstances of the particular case. 382 A.2d at 569, 570.

█ Here, the Trial Court found that defendants' conduct was not above reproach. Defendants were found to have used some twenty dollars worth of materi-

als that had belonged to SAC and charged some ten dollars worth of telephone calls to SAC that were made in connection with defendants' formation of Summagraphics. More importantly, the Court found that Whetstone had been "disloyal to SAC because, in a limited circulation prospectus for Summagraphics, he compared the SAC digitizer unfavorably with the proposed digitizer of Summagraphics." However, the Court also found that defendants had built the working model of Brenner's digitizer concept during their off-duty time and off company premises and without using any materials belonging to SAC.

Defendants were not under employment contracts with SAC or covenants not to compete. Thus, they were free to make reasonable preparations to compete while still employed by SAC and after quitting SAC's employ, to compete with SAC. *H & S Mfg. Co. v. Benjamin F. Rich Co.*, Del.Ch., 181 A.2d 431 (1962); *James C. Wilborn & Sons, Inc. v. Heniff*, Ill.App., 237 N.E.2d 781 (1968). Further, defendants' concealment from SAC of their plans to enter into competition with SAC was not, without more, a violation of their fiduciary duty of loyalty. To require employees to divulge such information to their employers "... would create an undesirable impediment to free competition in the commercial and industrial sectors of our economy." *Maryland Metals, Inc. v. Metzner, supra*, at 573.

█ Proof of serious employee misconduct causing injury to the employer must also be shown before relief will generally be granted.[8] Here, the Court had previously dismissed for want of proof SAC's claims charging defendants with theft of trade secrets, misuse of its customer lists and trade libel (see footnote page 960). Further, the Court found that SAC had failed to prove that defendants' conduct had caused it to suffer "any actual damages." Given such findings, we find no error of law committed by the Court; and we affirm its ruling that the evidence was insufficient to establish defendants' guilt

8. See authorities cited in *Maryland Metals* at pages 964, 965 above.

"of such breach of fiduciary duty as would justify the relief sought."

### C

▮ Further, we find no reversible error in the Court's finding that disclosure to SAC of Brenner's concept would have been "useless" to SAC. The ruling was legally correct as SAC could not lawfully make use of an inventive concept in which it had no property right or interest. *Cf. Daniel Orifice Fitting Co. v. Whalen, supra.* The ruling was also factually supported by the Court's findings as to SAC's poor financial condition and its inability or unwillingness to develop new products. *Cf. Kerrigan v. Unity Savings Association,* Ill.Supr., 317 N.E.2d 39 (1974).

### III

▮ SAC next contends that defendants breached, as a matter of law, their technology disclosure agreement with SAC, set forth at page 961 above, by not disclosing to SAC and making available to it Brenner's magwire concept. SAC argues that the agreement must be construed as bringing within its ambit inventions of its employees that are either "made or conceived" by them—with any such invention thereby becoming "the property of the Company." By virtue of defendants having *built* a working model of Brenner's concept, SAC argues that Brenner's invention came under the agreement. SAC says this result follows as a matter of law, because "built" is necessarily synonymous with "made"; but that the words "made" and "conceived" are clearly not synonymous. Hence, it is argued that the Trial Court committed legal error in not finding defendants to have breached their agreement with SAC by not disclosing Brenner's concept and making it available to SAC.

SAC's argument fails for several reasons. *First,* SAC completely ignores the Trial Court's express findings of fact which form the basis for its rejection of SAC's contention that defendants breached their agreement with SAC. Those findings were: (1) that Brenner's magwire concept constituted

an invention with "innovative differences" from SAC's digitizer and for which Brenner alone was entitled to credit; (2) that "the building of a model of the digitizer ... did not result in any improvement, discovery or invention" so as to confer joint or co-inventor status on defendants as to Brenner's invention; and (3) that the agreements which defendants made with SAC "provided only that SAC was entitled to any invention by them while they were employed at SAC"; that is, only "that any invention of theirs, whether patentable or not, invented by them while employees of SAC would be the property of SAC."

▮ *Second,* since the Trial Court based its rejection of SAC's breach of contract argument upon its construction of the agreement and express findings of fact related thereto, our standard of review is not whether the Court committed legal error but whether its interpretation of the agreement was clearly wrong under the test enunciated in *Levitt v. Bouvier,* Del.Supr., 287 A.2d 671 (1972). There, this Court ruled that if the findings of the lower Court, sitting without a jury, are "sufficiently supported by the record and are the product of an orderly and logical deductive process," such findings will be accepted unless "clearly wrong and the doing of justice requires their overturn." 287 A.2d at 673. The above-enumerated findings surely meet this standard. Indeed, to construe the agreement as contended by SAC and otherwise than as the Court did below, would, we think, be clearly unreasonable and contrary to law. SAC's construction of the agreement would have the effect of enabling an employee without a property interest in an invention to confer property rights on his employer merely by undertaking the physical act of assembling a working model of the product—in disregard of the rights of the owner-inventor. Thus, we think that the Court below gave the agreement its plain meaning in limiting its application to concepts or products which were the inventions of defendants made while employees of SAC. The Trial Court's rejection of SAC's breach of contract argument must be affirmed under *Levitt.*

IV

Lastly, as to the cross-appeal, Whetstone asserts that the Vice Chancellor erred in assessing costs against him. He contends that the Court did not provide a sufficient basis for altering the normal method of assessing costs against the losing party. Chancery Court Rule 54(d). *Gottlieb v. Heyden Chemical Co.*, Del.Supr., 105 A.2d 461 (1954).

■ We cannot conclude that the Vice Chancellor's award of costs was arbitrary or capricious and therefore his ruling will not be disturbed on appeal. While generally costs are assessed against the losing litigant, the Court of Chancery has discretion to award costs against the prevailing party when justice so requires. *Kennedy v. Emerald Coal & Coke Co.*, Del.Ch., 30 A.2d 269 (1943); 10 *Del.C.* § 5106; Chancery Court Rule 54(d). Hence, the award cannot be overturned absent a showing of an abuse of discretion. *Kennedy, supra.*

■ While the Court did not find Whetstone to be guilty of a breach of fiduciary duty so as to entitle SAC to equitable relief, the Court expressly found him to have been "disloyal" to SAC. In the Court's words, Whetstone had "in a limited circulation prospectus for Summagraphics ... compared the SAC digitizer unfavorably with the proposed digitizer of Summagraphics." Further, the Court had also found Whetstone to have made some improper use, admittedly limited, of SAC's facilities and materials. Thus, we do not find any abuse of discretion in the assessment of costs against defendant Whetstone.

Affirmed as to both appeal and cross-appeal.