77109. PEACHTREE PURCHASING COMPANY v. CARVER.
(374 SE2d 834)

Banke, Presiding Judge.

Carver sued Peachtree Purchasing Company (Peachtree) to recover monies alleged owed him pursuant to an "Employment Termination Agreement and Release" entered into by the parties. Peachtree counterclaimed based on allegations that Carver had breached the same agreement and had wrongfully appropriated a business relationship with one of its customers. A jury found in favor of Carver, awarding him $43,750 in damages, plus $12,582 in prejudgment interest and $35,590 in attorney fees. Peachtree appeals.

The evidence introduced at trial, construed in favor of the verdict, authorized the following factual findings. Peachtree is one of a number of companies controlled by John Portman, Jr., and is in the business of purchasing furniture, fixtures, and equipment for hotels. Carver had worked for the company for seven years and had served as its president for the last three of those years, when, in December of 1982, he was informed by Stanley P. Steinberg, a senior officer in the management of the Portman companies and a director of Peachtree, that someone else would be brought in to serve as Peachtree's president. Carver responded that he would be unable to stay with the company under those circumstances; and on January 29, 1983, he and Peachtree entered into the "Employment Termination Agreement and Release" on which this litigation is based. Pursuant to this agreement, Carver abandoned all ownership interest and rights in the company and agreed to "maintain and support the good reputation of Peachtree Purchasing, of John C. Portman, Jr., and of the corporations, partnerships, and other business activities in which John C. Portman, Jr., or any member of his immediate family presently has an ownership interest. . . ." In return, Peachtree agreed to make payments to Carver totaling $43,750. The agreement further specified that the parties were to enter into a "consulting agreement," the terms and conditions of which were not specified.

At the time the termination agreement was signed, Peachtree was seeking to be hired as the purchasing agent for a hotel which was being built in San Francisco. The company was, in fact, already being paid to perform certain preliminary services in connection with this project and had opened a West Coast office based in large part upon its efforts and expectations in this regard. Because Carver had a good

working relationship with the developer's project director, Chris MacDonald, his departure from Peachtree raised concern on the part of Steinberg that Peachtree might lose this job. Accordingly, after discussing the situation with MacDonald, Steinberg sent Carver to San Francisco as a consultant, as contemplated by the termination agreement, with oral instructions to "shepherd the project as necessary" until Peachtree's new president could take over. Carver agreed to this arrangement only reluctantly.

Carver arrived in San Francisco on January 31, 1983 (i.e., two days after signing the termination agreement) and met with MacDonald immediately thereafter. During this meeting, it became apparent to Carver that MacDonald was expecting him to remain as Peachtree's consultant for the duration of the hotel project. When he explained that his consulting arrangement with Peachtree was temporary and that he would not be available after the company's new president was in place, MacDonald told him that Peachtree would not be retained as the purchasing agent for the project under those circumstances and proposed that he come to work directly for the developers. Carver declined the offer and suggested that MacDonald meet with Peachtree's new president, but MacDonald was not interested.

Immediately after this meeting, Carver telephoned Steinberg to tell him that the decision had been made to give the hotel job either to him (Carver) personally or to another purchasing company, rather than to Peachtree. According to Carver, Steinberg's only response was to ask him to attempt to "arrange for some type of situation where Jean Anderson [Peachtree's project manager in San Francisco] could stay involved in the project." Testifying with apparent reference to this conversation during the trial, Steinberg stated: "I talked to [Carver] . . . about the possibility, if he stays as the project executive on their payroll, fine, but keep Peachtree Purchasing involved. . . ." Shortly after this conversation, MacDonald telephoned Steinberg and explained "that our owners wanted to have Mr. Carver as necessary and that under the proposed consulting arrangement that they didn't feel comfortable that it would work."

During the following days, MacDonald renewed his offer to Carver, and the two began to discuss terms. The next week, Carver tentatively accepted MacDonald's offer but told MacDonald that he (Carver) would have to "clear it" with Steinberg first. Carver thereupon returned to Atlanta, where, upon discussing the situation with Steinberg and Portman, he was met with expressions of displeasure.
*Held*:

1. Peachtree contends that it was entitled to a directed verdict both on Carver's complaint and on its counterclaim because the evidence established without dispute that Carver had breached a fiduciary duty of loyalty to the company by placing himself in a position

where his interests and the company's were in conflict.

"It is recognized, as a part of the general rule against an agent acting on his own account and adversely to his principal, that the rule is subject to qualification in that the agent may so act with the consent of the principal, freely given with full knowledge of the facts known to the agent which might affect the transaction. Even though the agent is dealing on his own account and for his own benefit, if the agent deals fairly and openly with the principal and if the principal has full knowledge of the material facts attending the transaction and which are known to the agent, the transaction is as valid as though consummated between the principal and some other person." 3 AmJur2d, Agency, § 229, p. 730.

"An agent, during the term of the agency, is subject to a duty not to compete with the principal concerning the subject matter of the agency, *unless the principal clearly consents or waives his rights.* Thus, an agent may not, without his principal's knowledge and consent, enter into any business in competition with the latter and make and keep for his individual use and benefit any profit accruing from the transaction. However, an agent is not absolutely precluded by law from competing with his principal. Rather, the right of an agent to engage in competitive business is dependent to a certain extent upon the character of the agency, the circumstances surrounding it, and the agreement, express or implied, of the parties; *and there is no violation of the agent's duty if the principal understands that the agent is to compete.* Nevertheless, an agent who engages in a business which might conflict with his principal's interests has a duty to exercise good faith by disclosing to the principal all the facts regarding the matter." Id., § 230, p. 731. (Emphasis supplied.) Accord *Spratlin, Harrington & Thomas v. Hawn,* 116 Ga. App. 175, 178-9 (156 SE2d 402) (1967); 3 CJS, Agency, § 281; Restatement (2d), Agency, § 393, Comment (a), p. 216. See also Restatement (2d), Agency, §§ 387, 390.

The jury was authorized to conclude from the testimony in this case that Carver had apprised Peachtree's management of his potential conflict of interest immediately upon learning of it and had been instructed to continue to represent the company's interests with respect to the project as best he could under the circumstances. In reviewing the denial of a motion for directed verdict, this court must construe the evidence most favorably to the party opposing the motion; and if there is any evidence to support a verdict in favor of that party, the trial court's ruling will not be disturbed on appeal. See *Minuteman Press Intl. v. Hedrick,* 167 Ga. App. 453 (306 SE2d 718) (1983). The evidence in this case, construed most favorably toward Carver, did not demand a verdict against him on either the complaint or the counterclaim.

2. We do not, however, find any evidentiary support for the

award of attorney fees. Carver contends that the award was authorized on the basis of Steinberg's alleged bad faith in "fraudulently" misrepresenting to him that his services as a consultant would be needed for only a short period of time, while simultaneously representing to MacDonald that he would be available as a Peachtree consultant for the duration of the project. It would, of course, have been pointless and self-defeating for Steinberg to have made such conflicting representations, and we have been cited to no evidence from which it could be inferred that he actually did so. Moreover, even accepting Carver's allegations in this regard as true, it is clear that he was not misled, since any misunderstanding which may have existed was cleared up immediately upon his arrival in San Francisco, yet he did not thereafter accuse Steinberg of misleading him but remained in San Francisco as Peachtree's consultant until such time as he agreed to go to work directly for MacDonald.

We find no evidence from which it could be inferred that Peachtree either procured or retained Carver's services as a consultant through bad faith, fraud or deceit. Nor do we find any other basis upon which the award of attorney fees could be upheld, it being apparent as a matter of law that Peachtree's refusal to pay Carver the sums called for under the termination agreement stemmed from a bona fide controversy as to whether he had used the consulting arrangement to promote his own interests over those of the company. While the company did not prevail in this dispute, it cannot be assessed attorney fees for litigating it. See generally OCGA § 13-6-11; *Ostrom v. Kapetanakos*, 185 Ga. App. 728 (2), 729 (365 SE2d 849) (1988); *Nestle Co. v. J. H. Ewing & Sons*, 153 Ga. App. 328 (4) (265 SE2d 61) (1980). The award of attorney fees is consequently reversed.

3. Pursuant to Peachtree's request, the trial court charged the jury that when an agent places himself in a position where his personal interests conflict with those of his principal, he is presumed to be disloyal and acquires the burden of proving that he made no profit from the transaction. Over Peachtree's objection, however, the court further charged the jury that in order for Peachtree to recover on its counterclaim for Carver's alleged breach of the consulting and/or termination agreements, it was required to "establish by a preponderance of the evidence that [Carver] failed to perform some obligation imposed on him under the terms of the agreement." Peachtree contends that this latter charge conflicted with its requested charge with respect to the burden of proof and was incorrect. We disagree.

Whether Carver had placed himself in a position where his interests conflicted with Peachtree's or whether Peachtree, with knowledge of all the facts, had instead placed him in that position was a question of fact to be resolved by the jury. Insofar as its counterclaim was concerned, the initial burden clearly lay on Peachtree to come forward

with evidence that Carver had violated some obligation to the company arising either from the oral consulting agreement or from the written termination agreement. Consequently, we find this enumeration of error to be without merit.

*Judgment affirmed in part and reversed in part. Birdsong, C. J., and Beasley, J., concur.*

DECIDED OCTOBER 31, 1988.

*C. B. Rogers, James W. Beverage,* for appellant.
*R. Michael Robinson,* for appellee.