A89A1579. PHOENIX AIRLINE SERVICES, INC. et al.
v. METRO AIRLINES, INC. et al.
(390 SE2d 219)

BANKE, Presiding Judge.

Appellee Metro Airlines, Inc., is a holding company which owns the stock of several "commuter-feeder" airlines. Such airlines typically provide connecting flights between a major regional airport

"hub" and smaller localities in the region, operating under a "service agreement" with a large trunk carrier whereby the commuter-feeder airline identifies itself with the larger carrier and coordinates its operations with those of the larger carrier at the major airport hub. One of the commuter-feeder airlines owned by Metro Airlines is appellee Metro Express, Inc., which operates out of Atlanta under a service agreement with Eastern Airlines. Appellants Michael J. Brady, John E. Molis, and Charles A. Miller are former officers and employees of Metro Express who left that company during its first year of operation to start a commuter-feeder airline based in Memphis, Tennessee, under a service agreement with Republic (now Northwest) Airlines. This new airline was incorporated as Express Airlines I, Inc., but has operated under the trade name, "Airlink," the name by which it will hereafter be referred to in this opinion. Airlink is in turn owned by appellant Phoenix Airline Services, Inc., approximately 95 to 98 percent of the stock of which is owned by appellant Brady.

Metro Airlines and Metro Express brought the present action against Brady, Molis, and Miller based on allegations that they had secretly made plans and arrangements for the formation of Airlink while still employed by Metro Express, thereby wrongfully appropriating to themselves a corporate business opportunity in violation of a fiduciary duty of loyalty owed both to Metro Express and to its parent company. The complaint further alleged that these plans and arrangements had been made on company time and through the use of company resources and that other Metro Express employees had been solicited to join in the new enterprise. Airlink and Phoenix Airline Services were also named as defendants, under the theory that they had conspired with Brady, Molis, and Miller to receive the fruits of their disloyal actions.

Each of the defendants denied liability; and, in addition, Brady and Miller counterclaimed to recover monies allegedly due them under a profit-sharing and bonus plan which was in effect at Metro Express during the period they were employed there. The case was tried before a jury, which found the defendants jointly liable for "compensatory" damages in the amount of $30,000,000 and, in addition, assessed punitive damages against Brady in the amount of $5,000,000, against Molis in the amount of $100,000, and against Miller in the amount of $10,000. The case is before us on appeal from the denial of the appellants' alternative motions for new trial and judgment notwithstanding the verdict.

Metro Airlines began establishing commuter-feeder airlines in Texas during the early 1980's and by 1983 was considering establishing a subsidiary in Atlanta to operate under a service agreement with Eastern Airlines. In the summer of that year, appellant Brady, who had previous experience operating a commuter airline in Atlanta, tel-

ephoned J. L. Seaborn, the president of Metro Airlines, to inquire about possible employment. Brady was ultimately hired by Metro Airlines to be the president of the new Atlanta-based subsidiary, which was incorporated as Metro Express. He then set about hiring his own senior staff, which came to include appellant Molis as vice-president in charge of operations and maintenance and appellant Miller as director of maintenance. In addition to being named president of the new subsidiary, Brady was also named as one of its three directors, the other two being the parent company's president, Seaborn, and its board chairman, Edmond Henderson.

Metro Express commenced operations on April 4, 1984, and was an immediate financial success. There was testimony that upon being informed by the company's director of finance that the airline had earned a profit of more than $100,000 during its first month of operation, Brady made a statement to the effect of: "Wouldn't it be great to be doing this for ourselves." During June of 1984, while on a business trip for the company, Brady learned that TransWorld Airlines was looking for a commuter-feeder partner for its hub in St. Louis; and he subsequently learned that Republic Airlines was interested in securing a commuter-feeder partner for its hub in Memphis. Brady pursued these opportunities during the remainder of 1984 with the assistance of Molis and other Metro Express personnel, taking care to conceal his efforts in this regard from Seaborn and Henderson. The negotiations with Republic bore fruit, and by letter to Brady dated December 20, 1984, that airline confirmed its intent "to proceed with a ten-year service agreement with Phoenix Express Airlines Services, Inc."

Brady resigned from Metro Express on January 8, 1985. Phoenix Airline Services, Inc., was incorporated the following day, and approximately a month later it entered into a ten-year contract with Republic to operate a commuter-feeder airline out of Memphis. Molis had already resigned from Metro Express approximately two weeks prior to Brady's departure to devote his full attention to the new venture; and Miller joined them later, as did various other Metro Express employees, including its vice president of sales and service and its chief pilot. In October of 1985, Airlink entered into a second service agreement with Republic to service its hub in Minneapolis/St. Paul. Republic was subsequently purchased by Northwest Airlines, following which Airlink changed its name to "Northwest Airlink" and began servicing that company's hub in Milwaukee, while maintaining its existing operations in Memphis and Minneapolis/St. Paul. *Held*:

1. The appellants contend that they owed no fiduciary duty of loyalty to Metro Airlines because they were not employed by that company and that they breached no fiduciary duty of loyalty to Metro Express because that company was established for the exclu-

sive purpose of operating a commuter-feeder service in Atlanta under a contract with Eastern and therefore was not in a position to contract with Republic to operate a commuter-feeder service out of Memphis. We find these contentions to be without merit.

Both Metro Airlines and Metro Express are Delaware corporations, and the parties are in agreement that the law of that state is therefore determinative of the nature and scope of the fiduciary duties at issue. See generally *Diedrich v. Miller &c. Assoc.*, 254 Ga. 734 (1) (334 SE2d 308) (1985). Under Delaware law, "[c]orporate officers and directors . . . stand in a fiduciary relation to the corporation *and its stockholders.*" (Emphasis supplied.) *Guth v. Loft, Inc.*, 5 A2d 503, 510 (Del. 1939). Accord *Smith v. Van Gorkom*, 488 A2d 858, 872 (Del. 1985). This relationship arises from traditional agency principles and applies "not only to officers and directors but also to key managerial personnel." *Science Accessories Corp. v. Summagraphics Corp.*, 425 A2d 957, 962 (Del. 1980). Based on these authorities, we conclude that, in their capacity as officers, directors, and/or key employees of Metro Express, the appellants owed a fiduciary duty of loyalty both to Metro Express and to its parent company, Metro Airlines. Accord *Anadarko Petroleum v. Panhandle Eastern*, 545 A2d 1171, 1174 (Del. 1988) (holding that "in a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated *only* to manage the affairs of the subsidiary in the best interests of the parent and its shareholders)." (Emphasis supplied.)

2. Under Delaware law, the fiduciary duty of loyalty which is owed to a corporation by its officers, directors, and managerial employees must be balanced against "an off-setting policy 'recognized by the courts . . . of safeguarding society's interest in fostering free and vigorous competition in the economics sphere. . . . This policy in favor of free competition has prompted the recognition of a privilege in favor of employees which enables them to prepare or make arrangements to compete with their employers prior to leaving the employ of their prospective rivals without fear of incurring liability for breach of their fiduciary duty of loyalty.'" *Science Accessories v. Summagraphics*, supra, 425 A2d at 963, quoting from *Maryland Metals v. Metzner*, 382 A2d 564, 569 (Md. App. 1978). In an effort to reconcile these competing interests, the "doctrine of corporate opportunity" has been developed. Different jurisdictions have different tests to determine whether a business opportunity constitutes a corporate as opposed to a private opportunity; however, it has been stated by one commentator that "[u]nder any test, a corporate opportunity exists when a proposed activity is reasonably incident to the corporation's present or prospective business and is one in which the corporation has the capacity to engage." Fletcher, Cyclopedia of Corps., § 861.1, pp. 285-6 (1986 ed.).

Under Delaware law, a business opportunity will be considered a corporate rather than a private opportunity "if: (a) the corporation is financially able to undertake it; (b) it is within the corporation's line of business; (c) the corporation is interested in the opportunity." *Science Accessories v. Summagraphics*, supra at 963. If, on the other hand, " 'the opportunity[ ] is not one which is essential or desirable for [the] corporation to embrace, being an opportunity in which it has no actual or expectant interest, the officer is entitled to treat the business opportunity as his own and the corporation has no interest in it, *provided the officer has not wrongfully embarked the corporation's resources in order to acquire the business opportunity.' "* (Emphasis supplied.) Id. at 963, quoting *Equity Corp. v. Milton*, 221 A2d 494, 497 (Del. 1966). Under the latter circumstances, i.e., where the officer has utilized the resources of the corporation to acquire the opportunity, he is estopped from asserting that the corporation had no interest in it. "In this regard, a fiduciary's compensated time is regarded as a corporate asset; accordingly, the rule of estoppel applies to a person who uses 'company' time to develop a business opportunity." Fletcher, Cyclopedia of Corps., supra at p. 287.

The evidence presented during the trial of this case, construed in favor of the verdict, was amply sufficient to support a determination that the appellees were financially capable of establishing a new airline to service Republic's Memphis hub; and there is no question that such expansion would have been within their line of business. We believe that the jury could further have determined from the evidence that the appellees would have been interested in pursuing this opportunity had the appellants disclosed it to them in a timely manner rather than secretly pursuing it themselves. Moreover, since there was evidence from which the jury could have determined that the appellants had pursued and developed the opportunity on company time, and since any uncertainty which may exist as to whether and how vigorously the appellees would have pursued the opportunity had it been brought to their attention is attributable to the appellants' conduct in concealing their own interest in it, we do not believe that the appellants are in a position to complain of a lack of proof on this latter issue. "[T]he appropriate method to determine whether or not a corporate opportunity exists is to let the corporation decide at the time the opportunity is presented." Fletcher, supra at p. 288. We have no hesitancy in concluding that the evidence in this case supports the jury's finding that the appellants breached a fiduciary duty of loyalty both to Metro Express and to Metro Airlines by appropriating the Republic opportunity for themselves.

3. The appellants contend that no evidentiary basis exists in this case for an award of actual damages in the amount of $30,000,000. We agree.

Although the appellees presented evidence that they had suffered some unspecified amount of injury to their existing business operations as the result of the appellants' actions, no attempt was made to quantify this injury; and the appellees do not argue that the jury's award can be justified as compensation for any actual losses they may have sustained. Rather, they seek to justify the award either as an estimate of the potential profit which they lost as the result of the appellants' actions or as an estimate of the profits realized by the appellants.

Under Delaware law, "[i]f an officer or director of a corporation, in violation of his duty as such, acquires gain or advantage for himself, the law charges the interest so acquired with a trust for the benefit of the corporation, at its election, while it denies to the betrayer all benefit and profit. The rule, inveterate and uncompromising in its rigidity, does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation." *Guth v. Loft, Inc.*, supra, 5 A2d at 510. "And if, in such circumstances, the interests of the corporation are betrayed, the corporation may elect to claim all of the benefits of the transaction for itself, and the law will impress a trust in favor of the corporation upon the property, interests and profits so acquired. (Cits.)" Id. at 511.

The jury in this case was presented with an alternative verdict form giving them the choice, in the event they found in favor of the appellees, of either assessing monetary damages against one or more of the appellants or "plac[ing] the assets and stock of defendant corporations in a constructive trust for the benefit of the plaintiff[s]." The appellants contend that, having rejected the constructive trust option in favor of a monetary award, the jury was not entitled to consider the profits realized by the appellants as a result of the establishment of Airlink but was required to base its award on evidence of actual losses sustained by the appellees. We are aware of no authority which supports this contention. A constructive trust is merely a type of equitable remedy designed to provide relief against unjust enrichment. See generally 76 AmJur2d, Trusts, §§ 221-2. If adequate relief can be provided through an award of monetary damages, that alternative clearly is not rendered inappropriate by the fact that an equitable remedy may have been considered and rejected. Indeed, there may be circumstances in which adequate relief can be afforded only through the use of *both* remedies. See, e.g., *Borden v. Sinskey*, 530 F2d 478 (3rd Cir. 1976). However, where an award of monetary damages is made for unjust enrichment, it must, of course, be supported by evidence from which it can be determined to a reasonable cer-

tainty that the defendants in fact realized such a gain. See generally *DeJong v. Stern*, 162 Ga. App. 529 (1) (292 SE2d 115) (1982). "An allowance for damages cannot be based on guesswork. [Cits.] 'Loss of anticipated profits which is completely conjectural is not recoverable.' [Cit.]" Id. at 530. Accord *Farmers Mut. Exchange v. Dixon*, 146 Ga. App. 663, 664-5 (5) (247 SE2d 124) (1978); *Fidelity Nat. Bank v. Wood*, 189 Ga. App. 109 (375 SE2d 228) (1988).

The appellees have suggested four alternative theories upon which the jury could have based its award of damages in this case, and we shall address these theories seriatim. First, the appellees contend that the award was supported by evidence that Airlink had earned gross annual revenues averaging approximately $67,000,000 during the two fiscal years immediately preceding the trial, combined with evidence that Metro Express had never operated at a profit margin of less than 10 percent. The appellees maintain that it may be inferred from this evidence that if they, rather than the appellants, had obtained the contract with Republic, they would have been able to earn at least $67,000,000 in profits over the course of its ten-year term. We find this argument utterly meritless. As previously indicated, there was no evidentiary basis upon which the jury could have awarded damages to the appellees for any actual injury to their existing business operations. Thus, if the award of damages in this case is to be sustained, it must be sustained as an estimate of the unjust enrichment realized by the appellants as a result of their misconduct. The amount of profit the appellees might hypothetically have realized from the opportunity had they pursued it affords no basis for a recovery under the present circumstances.

The appellees further contend that the award can be justified as a reasonable estimate of the actual profits which Airlink had thus far earned and the projected profits which it still stood to earn under the ten-year Republic contract. In its audited financial statements, Airlink had reported total net profits in the approximate amount of $6,600,000 during the three fiscal years that it had been in operation prior to trial. Based on the assumption that this level of profitability would continue, the appellees contend that the jury could reasonably have determined that the airline stood to earn profits totaling $22,000,000 over the life of the contract. The most obvious problem with this calculation is that, even assuming arguendo the reasonableness of the assumptions on which it is based, it is $8,000,000 shy of supporting a $30,000,000 award. Additionally, we note that in cases where an award of damages is sought based on the loss of future income, it is normally necessary to introduce evidence from which the present value of such income may be ascertained, inasmuch as a recovery of future damages without reduction to present value would "bear[ ] no reasonable relationship to probable actual damages suf-

fered. . . ." *Taylor v. Commercial Credit Equip. Corp.*, 170 Ga. App. 322, 322-3 (316 SE2d 788) (1984).

The appellees next assert that the profit figures reported by Airlink were understated by the amount of certain "management" fees that company had paid to its parent company, Phoenix Airline Services, and that if these fees, which amounted to some $5,500,000 over the two years prior to trial, are taken into consideration the award of $30,000,000 is justified. The contention that these fees did not constitute legitimate operating expenses is based on certain testimony by Seaborn to the effect that Metro Airlines was capable of overseeing additional operating companies without incurring any additional overhead. However, Brady testified without dispute that Metro Airlines did not provide support services to its subsidiaries but set them up to operate independently, whereas Phoenix had provided accounting, training, and engineering services to Airlink. Brady further testified without dispute that "almost all" of the management fees paid to Phoenix by Airlink had been used to pay the salaries of the Phoenix personnel who had provided such services to that company. In the face of this undisputed testimony, there was no evidentiary basis upon which the jury could have treated these fees simply as additional profit to the appellants.

The appellees finally contend that the jury could legitimately have based its award on Seaborn's testimony that commuter airlines are worth "an amount equal to between 80-83% of the[ir] gross operating revenues. . . ." Seaborn's testimony on this point was actually as follows: "Q: What is American Airlines currently paying for the commuter airlines it's acquiring, what is the formula they're using? . . . A: They have bought five this past year and the common thread among all of them is a percentage of the total revenue, and that runs about 80 to 83 percent of the total revenue."

Even assuming arguendo that this testimony had any probative value on the issue of what American Airlines had paid for the last five commuter airlines it had acquired, the jury clearly was not entitled to conclude that Airlink's worth could be calculated in like manner absent evidence that it was comparable to the airlines acquired by American in such areas as profitability, financial structure, and future business prospects. Nor have we been cited to any other evidence from which the jury could have estimated the net worth or market value of either of the appellant corporations. We are thus left with no basis upon which the $30,000,000 award can be sustained. We accordingly hold that the trial court erred in denying the appellants' motion for new trial. "Such new trial, however, properly should be limited to the issue of damages since the original verdict established liability. [Cits.]" *Clark v. Wright*, 137 Ga. App. 720, 723 (224 SE2d 825) (1988). Accord *Petty v. Barrett*, 187 Ga. App. 83 (369 SE2d 294)

(1988).

4. Having reversed the jury's award for other reasons, we do not reach the troublesome issue of whether, in the absence of evidence demonstrating an actual, quantifiable injury to the claimant, one defendant may ever be held jointly liable with a second defendant for an unjust enrichment which the second defendant alone realized. We note, however, that the theoretical basis for the imposition of joint and several liability upon joint tortfeasors, i.e., that all who joined in the commission of the wrong should be held fully responsible for the damage occasioned by their conduct, (see generally *Eidson v. Maddox*, 195 Ga. 641, 644 (24 SE2d 895) (1943)), would appear to be of doubtful applicability where the sole purpose of the award is to prevent unjust enrichment rather than to compensate a claimant for actual loss.

5. The appellants contend that the trial court erroneously shifted the burden of proof to them by instructing the jury that "once it is established that an opportunity is presented to an officer, he must prove that he acted in the utmost good faith; and if he claims it is not feasible for his employer to pursue the opportunity, he must prove to you this is the case." In the context in which it was given, this charge was entirely proper. The trial court had previously charged the jury that each party had the burden of proving any claims it was asserting by a preponderance of the evidence. The language complained of properly instructed the jury that once the appellees had carried their initial burden of establishing that the appellants were presented with a corporate opportunity, the burden shifted to them to show that they had acted in good faith in dealing with this opportunity and that no disloyalty had in fact occurred. See *Guth v. Loft, Inc.*, 5 A2d 503, 512, supra. See also Callaghan, Law of Corporate Officers & Directors, § 3.04 (3d ed. 1986), and cases cited therein; Knepper, Liability of Corporate Officers & Directors, § 3.04 (3d ed. 1978). Cf. *Peachtree Purchasing Co. v. Carver*, 189 Ga. App. 73 (3) (374 SE2d 834) (1988).

6. Appellants Brady and Miller contend that they were entitled to a directed verdict on their counterclaim against Metro Express for the profit-sharing funds allegedly due them. We disagree. There was testimony that the purpose of the profit-sharing plan was to provide the company's employees an incentive to remain employed and to expend their best efforts on behalf of the company. The original memorandum regarding the plan, drafted by Brady, specified that only active employees would be entitled to distributions; and the company's personnel policies manual reflects that this plan was in effect when Brady and Miller resigned. The jury was authorized to conclude from this evidence that the two men were not entitled to further payments from the fund subsequent to their resignation.

7. The appellants' remaining enumerations of error are either

without merit or have been rendered moot by the foregoing. For the reasons previously stated, we hold that the trial court erred in denying the appellants' motion for new trial with respect to the issue of damages. However, because the evidence would have authorized an award of damages in favor of the appellees in some amount, the appellants' motions for directed verdict and judgment notwithstanding the verdict were properly denied. Accord *Turner v. Conner*, 192 Ga. App. 348 (385 SE2d 19) (1989).

*Judgment affirmed in part and reversed in part. Sognier, J., concurs. Pope, J., concurs specially.*

Pope, Judge, concurring specially.

As discussed in the majority opinion, the award of damages in this case cannot be supported by either of the four alternative theories of recovery advocated by the appellees to sustain the award. More importantly, none of these four theories represents the proper method of measuring damages in a usurpation of corporate opportunity case. The remedy in such a case is to disgorge the tortfeasors of any and all benefits from their tortious acts. Clearly, appellees in this case are entitled to a monetary award for the profits earned to date in the usurped enterprise. This would include not only corporate profits but also compensation earned by the individual appellants minus the value of the reasonable compensation to which appellants were entitled for the efforts they expended in developing the usurped opportunity. See *Graham v. Mimms*, 111 Ill. App. 3d 751 (444 NE2d 549) (1982). To compensate appellees for the future value of the usurped opportunity, "[t]he traditional remedy . . . is a constructive trust imposed for the benefit of the [plaintiff] corporation." *Morad v. Coupounas*, 361 S2d 6, 10 (Ala. 1978). Accord *In the Matter of Safety Intl.*, 775 F2d 660 (5th Cir. 1985). As I see it, in addition to an award for past profits a jury may, in equity, award appellees the beneficial ownership of the appellant corporations' stock or may award monetary damages representing the value of the stock of the appellant corporations minus a set-off for expenditures made by the tortfeasors in acquiring the stock. See *Borden v. Sinskey*, 530 F2d 478, 496-499. See also *Guth v. Loft, Inc.*, 5 A2d 503 (Del. 1939). In either case appellees would thus be compensated for future profits earned by the tortfeasors either by earning the profits themselves, as beneficial owners of the corporation, or by obtaining an award of the value of the appellant corporations, a figure which logically would be based in part on anticipated earnings and the value to appellants of the remaining term of the ten-year contract with Northwest Airlines.

The award of thirty million dollars was unsupported at the trial of the case by evidence of past profits plus the value of the appellant corporations. On retrial of the issue of damages these elements must

be proven to sustain a monetary award.

DECIDED DECEMBER 4, 1989 —
REHEARING DENIED DECEMBER 20, 1989 —

*Schreeder, Wheeler & Flint, David H. Flint, Alexander J. Simmons, Jr., Alston & Bird, G. Conley Ingram, Robert D. McCallum, Jr.,* for appellants.
*William W. Gardner, Hishon & Ranney, Jonathan Moonves,* for appellees.