**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

|  |  |
|---|---|
| FAIRSTEAD CAPITAL MANAGEMENT LLC and FCM AFFORDABLE LLC,<br><br>  Plaintiffs,<br><br>  v.<br><br>WILLIAM BLODGETT,<br><br>  Defendant. | C.A. No. 2022-0673-JTL |

**OPINION ADDRESSING MOTIONS FOR SUMMARY JUDGMENT**

Date Submitted: January 20, 2026
Date Decided: May 13, 2026

Ryan D. Stottmann, Thomas P. Will, Alec F. Hoeschel, Phillip Reytan, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Rollo C. Baker, Jared Ruocco, Edgar Aliferov, ELSBERG BAKER & MARURI PLLC, New York, New York; Michael B. Carlinsky, Evan Forbes, QUINN EMANUEL URQUHART & SULLIVAN LLP, New York, New York; *Attorneys for Plaintiffs/Counterclaim-Defendants.*

David E. Ross, Roger S. Stronach, Holly E. Newell, A. Gage Whirley, ROSS ARONSTAM & MORITZ LLP; Wilmington, Delaware; Jacob W. Buchdahl, Elisha B. Barron, Zach Fields SUSMAN GODFREY LLP, New York, New York; *Attorneys for Defendant/Counterclaim-Plaintiff.*

**LASTER, V.C.**

Two long-time business associates—a hedge fund manager and his personal attorney—teamed up with William Blodgett, an expert in affordable housing. They formed a fund complex to invest in affordable housing projects.

The business grew, and Blodgett expanded his team to include John Tatum. Together, they created a new arm of the business that invested in deals funded in part by affordable-housing tax credits. The attorney nominally oversaw their work. The hedge fund manager remained in the background.

As the business became more successful, Blodgett and Tatum decided that they deserved a bigger piece of the pie. The attorney encouraged them to develop an equity restructuring plan, but warned them that the hedge fund manager needed to recover his capital before he gave them a larger stake in the firm.

Blodgett and Tatum grew impatient. They developed two plans: one involved restructuring the business to give them control; the other involved them leaving and starting a competing company. When developing the plans, Blodgett shared confidential information with members of his family and their advisors.

The hedge fund manager rejected the restructuring plan, so Blodgett and Tatum decided to leave. They began negotiating the terms of their departures.

Meanwhile, the attorney had started monitoring Blodgett's emails. The attorney spotted an invoice from an outside law firm for "Newco Formation." The attorney concluded that Blodgett did not intend to leave on good terms, and the hedge fund manager promptly terminated Blodgett for cause. The termination letter purported to cancel all of Blodgett's equity.

Blodgett filed an arbitration for breach of his employment agreement. The hedge fund manager and the attorney caused two affiliates to sue Blodgett in this court for breach of the affiliates' LLC agreements. Blodgett counterclaimed against the affiliates, contending they breached their LLC agreements by improperly cancelling his equity.

After the arbitrator issued an award, the parties cross-moved for summary judgment. Based on the arbitrator's findings, Blodgett is entitled to summary judgment.

Blodgett is entitled to summary judgment on the affiliates' claims for breach of their LLC agreements because Blodgett acted as an employee, not as a member. His employment agreement governed his conduct as an employee. He did nothing as a member that could implicate the restrictions on member activity in the LLC agreements.

The court previously granted summary judgment for Blodgett on whether the affiliates breached their LLC agreements by purporting to cancel Blodgett's equity. He remains entitled to summary judgment on that issue. The arbitrator found that Blodgett's employment agreement authorized the cancellation of his equity interests in pending deals, but not Blodgett's equity interests in non-pending deals. The LLC agreements do not contain any language giving the affiliates a separate right to cancel Blodgett's equity interests. They establish a window that permits cancellations under the employment agreement, but do not contain an independent cancellation right. By purporting to rely on the LLC agreements as a basis for cancellation, and

2

by cancelling Blodgett's equity interests in non-pending deals, the affiliates breached their LLC agreements.

## I. FACTUAL BACKGROUND

The facts are drawn from findings made in a related arbitration between the parties (the "Award"),[1] findings made in a related litigation involving Tatum,[2] and the submissions made in support of the parties' cross-motions for summary judgment.[3] Principles of issue preclusion make the findings in the arbitration and the *Tatum* litigation binding on the parties.[4]

---

[1] *See Blodgett v. Fairstead Cap. Mgmt. LLC, et. al.*, Interim Award, No. 5425000366 (JAMS Apr. 2, 2025) (Roberts, Arb.). Citations in the form "Award at __" refer to the arbitral award. The award styles itself as an "Interim Award," but the parties have treated it as a final award for preclusion purposes.

[2] *Tatum v. Fairstead Affordable LLC*, 347 A.3d 1221 (Del. Ch. 2025).

[3] Citations in the form "Fairstead OBX __ at __" and "Fairstead RBX __ at __" refer to exhibits that Fairstead submitted with its opening brief or reply brief. Dkts. 213, 221. Citations in the form "Blodgett OBX __ at __" and "Blodgett RBX __ at __" refer to exhibits that Blodgett submitted with his opening brief and reply brief. Dkts. 219, 226. Citations in the form "Ruling Tr. __" are to the transcript of the telephonic ruling on February 11, 2025. Dkt. 238.

[4] Restatement (Second) of Judgments § 27 (A.L.I. 1982); *see Messick v. Star Enter.*, 655 A.2d 1209, 1211 (Del. 1995) ("Under the doctrine of collateral estoppel, if a court has decided an issue of fact necessary to its judgment, that decision precludes relitigation of the issue in a suit on a different cause of action involving a party to the first case."). Delaware courts frequently rely on the Restatement when analyzing issue preclusion. *See In re Columbia Pipeline Gp., Inc.*, 2021 WL 772562, at *16 (Del. Ch. Mar. 1, 2021) (collecting authorities).

Blodgett was not a party to the *Tatum* litigation, and a judgment ordinarily does not bind a non-party. Restatement (Second) of Judgments, *supra*, § 34(3). It can, however, if the party and non-party are in privity. That elusive term means they have

## A.    Fairstead's Origins

In October 2013, Blodgett, Jeffrey Goldberg, and Stuart Feldman started an affordable housing business. Operating under the trade name "Fairstead," they would source, develop, own, and manage a portfolio of real estate investments.[5]

Feldman, a hedge fund manager, served as Fairstead's primary source of capital. He exercised ultimate decision-making authority over the business.

Goldberg, Feldman's personal attorney, acted as CEO. Goldberg was nominally in charge of day-to-day operations, but he did not know much about affordable

a pre-existing legal relationship, outside of the prior litigation, that is sufficient to cause the adjudication to be binding. *See Columbia Pipeline*, 2021 WL 772562, at *17. Partners in a common law partnership are in privity as to the subject matter of the partnership. *See Bradshaw v. Trover*, 1999 WL 463847, at *2 (Del. Ch. Apr. 30, 1999) ("As at common law, partnerships may still sue and be sued by use of the names of individual partners without naming the partnership itself."). Blodgett and Tatum formed a common law partnership and operated as joint venturers for purposes of their plan to negotiate for a controlling interest in Fairstead's affordable housing business and, if Fairstead refused, leave Fairstead to start a new business. *See* Award at 15, 18; *Tatum*, 347 A.3d at 1235 n.12. Blodgett is therefore in privity with Tatum for purposes of factual findings in the *Tatum* litigation to the extent those issues were (i) "actually litigated and determined" in the *Tatum* Litigation, (ii) "essential to the judgment," and (iii) concerned the period when Blodgett and Tatum were in privity, *i.e.*, through the point when Fairstead terminated Blodgett. *Columbia Pipeline*, 2021 WL 772562, at *16.

[5] The fund complex comprised a variety of entities, including Fairstead Capital Management LLC, FSC Realty Management LLC, FCM Affordable LLC, Fortitude Realty Management LLC, FSC EF&F LLC, Fortitude Properties LLC, FSC-JD2 Member LLC, FCM-JD2 LLC, and other special purpose vehicles for each project. For simplicity, this decision uses the term "Fairstead" to refer to the business collectively unless the individual entity name is relevant.

housing before the disputes that led to this litigation. Until then, he relied on Blodgett to run the business.

Blodgett provided the vision and the energy. He ran the day-to-day operations and assembled a team that included Tatum, Billy Kreinik, Tyler McIntyre, and Adam Sussi. Initially, Blodgett focused on acquiring market-rate, rent-stabilized housing units in New York City.[6] After Tatum joined, the team also sourced transactions funded in part by tax credits.[7]

## B.     Blodgett's Employment Agreement

Blodgett entered into an employment agreement with Fairstead dated October 25, 2013 (the "Employment Agreement").[8] The specific counterparty was Fortitude Realty Management, LLC ("Fortitude"), an entity in the Fairstead fund complex.

The Employment Agreement contemplated that Blodgett would provide investment advisory services to Fortitude and its affiliates. As compensation, he would receive (a) a base salary of $150,000; (b) a discretionary bonus equal to not less than one-third of base salary; and (c) 15% of the carried interest that Fairstead received in each deal.

---

[6] *See Tatum*, 347 A.3d at 1236.

[7] *See id.* at 1237–39 (explaining the tax credit business).

[8] *See* Fairstead OBX 2 (cited as "EA").

Section 6 of the Employment Agreement imposed a broad confidentiality obligation on Blodgett.[9] Section 11 required that Blodgett comply with all company policies.[10]

The Employment Agreement specified what would happen to the carried interest if Blodgett and Fairstead parted ways. As interpreted in the Award, the Employment Agreement gave Fairstead a limited right to cancel Blodgett's interests in still-pending deals if Blodgett was terminated for breaching either Section 6 or Section 11 of the Employment Agreement.[11] Otherwise, Fairstead did not have the right to cancel Blodgett's interests.

## C.    The Spoils Of Success

Fairstead enjoyed considerable success, and Blodgett and Tatum believed they were chiefly responsible for it. That was true. Blodgett and Tatum also believed they had created tremendous value for Feldman and Goldberg. That was also true.

Blodgett and Tatum decided that because they had built a valuable business, they deserved a greater equity stake in it. They also wanted their team members and future employees to have more equity participation. They spoke with Goldberg about the issue, and Goldberg agreed that something needed to be done. But Goldberg didn't

---

[9] *Id.* § 6.

[10] *Id.* § 11.

[11] Award at 29.

6

have the final say. He needed to convince Feldman, and he wanted to proceed carefully.

Blodgett and Tatum grew frustrated with Goldberg's lack of progress. By early 2020, they decided that they needed to force the issue. At this point, they wanted Feldman and Goldberg to give Blodgett control over Fairstead and to reallocate the bulk of the equity to Blodgett, Tatum, and their team.[12] They also knew that to be able to negotiate effectively, they needed a credible alternative. To that end, they pursued a two-part strategy. Their preferred outcome—Plan A—involved restructuring Fairstead so they would hold the bulk of the equity and control the business (the "Restructured Fairstead Option").[13] Their alternative—Plan B—was to start their own business if Feldman and Goldberg did not agree (the "Separate Company Option").

When planning and preparing, Blodgett and Tatum used their personal email accounts to communicate.[14] Blodgett also used his personal email account to communicate with his advisors.[15]

---

[12] *Id.* at 15 ("[B]y 2020, if not earlier, Blodgett viewed Fairstead as 'his company,' and became determined, if not obsessed with obtaining 'control' of Fairstead . . .").

[13] *See Tatum*, 347 A.3d at 1240.

[14] Award at 16, 18.

[15] *Id.* at 15–19.

7

Blodgett had married into two billionaire families, and each has a family office. One is the Sussman Office. The other is the Tisch Office.

In February 2020, Blodgett contacted Ophir Barone, the Chief Investment Officer for the Sussman Office, to solicit help with his plans. Almost immediately, Blodgett began sending Barone confidential Fairstead information. [16] Over the following months, Blodgett communicated regularly with Barone about both the Restructured Fairstead Option and the Separate Company Option. Later, Blodgett would bring in the Tisch Office.

## D.     The Initial Plan For The Restructured Fairstead Option

On March 31, 2020, Tatum sent Goldberg a memorandum outlining a business plan for the Restructured Fairstead Option. The plan contemplated a new capital infusion from outside investors, a return of capital to Fairstead's original partners, and future distributions of Fairstead profits. Most significantly, it contemplated that the entity contributing the capital—"NewCo"—would hold a controlling stake. Blodgett and Tatum would jointly own 50% of NewCo and allocate a portion to key employees. Feldman would own the other 50%.[17] The next day, Blodgett forwarded the plan to Barone.

Goldberg had supported Blodgett and Tatum's desire for a restructuring, but he did not want to antagonize Feldman. He also did not want to create evidence of his

[16] *Id.* at 16.

[17] *See Tatum*, 347 A.3d at 1240.

8

support for Blodgett and Tatum. To that end, he never responded to their proposal in writing, and he advised Blodgett and Tatum to communicate using an ephemeral messaging platform.[18]

Goldberg told Blodgett and Tatum that he would not present their plan to Feldman, but that they should develop their idea further.[19] Over the next few months, Goldberg, Blodgett, and Tatum spoke repeatedly about the restructuring. Each time, Blodgett and Tatum emphasized that providing equity was a necessary next step to attract and retain employees. Goldberg agreed, but he told Blodgett and Tatum that a restructuring could not happen until Feldman had recovered all of his initial investment. That would be in 2021 at the earliest.[20]

Blodgett and Tatum initially accepted that timeline. But they soon decided to push for change faster. They resolved that if they could not achieve the Restructured Fairstead Option in the near term, they would leave Fairstead and pursue the Separate Company Option.[21]

### E. More Planning

As spring turned to summer, Tatum and Blodgett retained the law firm of Rodriguez & Wright to advise them. They asked Rodriguez & Wright to prepare a

---

[18] *See* Award at 17 n.4.

[19] *See Tatum*, 347 A.3d at 1240.

[20] *See id.* at 1241.

[21] *See id.* at 1242.

9

proposal for the Restructured Fairstead Option that they could share with Goldberg.[22]

Later that summer, Tatum and Blodgett met with Barone to discuss their options. On August 27, 2020, Barone sent Blodgett a list of key points for "Fairstead 2.0." On September 3, Barone forwarded the proposal to Donald Sussman, Blodgett's father-in-law. Barone noted that ideally the Sussman Office would fund 100% of the new business, but that Blodgett wanted to have Feldman remain involved and provide 50% of the funding.[23] At this point, Blodgett "clearly preferred to attempt to negotiate a 'Fairstead 2.0' reorganization of Fairstead that provided him substantially more equity and control," but he was also "seriously exploring the option of leaving Fairstead and forming a new entity."[24] In other words, the Restructured Fairstead Option remained Plan A.

That fall, Blodgett reached out to the Tisch Office. He and Tatum explored whether the Tisch Office would provide capital for either the Restructured Fairstead Option or the Separate Company Option.[25]

---

[22] Award at 18; *Tatum*, 347 A.3d at 1243.

[23] *Tatum*, 347 A.3d at 1243.

[24] Award at 18.

[25] *Tatum*, 347 A.3d at 1244.

10

## F.     A Revised Plan For The Restructured Fairstead Option

By early 2021, Blodgett and Tatum had a new proposal. On February 25, they sent it to Goldberg. In addition to restructuring the equity, it contemplated Blodgett replacing Goldberg as Chief Executive Officer and Tatum becoming Chief Operating Officer. Goldberg rejected it.

Based on Goldberg's reaction, Blodgett and Tatum concluded that he was only interested in tweaking the status quo.[26] Blodgett and Tatum decided that they needed to develop the Separate Company Option. They still preferred the Restructured Fairstead Option, but they felt they needed a meaningful alternative for negotiation purposes and in case they had to pursue it.

In April 2021, Blodgett secretly forwarded confidential Fairstead information to the Tisch and Sussman Offices. The materials included an internal valuation of the tax-credit business and financial projections for the properties owned by Fairstead.[27] Around the same time, Blodgett forwarded a confidential investment opportunity to both the Tisch and Sussman Offices. He was not trying to divert the opportunity, but rather to "show his potential backers what an average team's affordable housing deal looked like with the expectation that 'we would do far better.'"[28] Although that conduct was not as bad as if Blodgett had tried to usurp the

---

[26] Award at 19.

[27] *Id.*

[28] *Tatum*, 347 A.3d at 1244–45 (quoting Blodgett's trial testimony).

opportunity, he was still using Fairstead's confidential information to secure backing for his plans.

Both the Sussman and Tisch Offices stood ready to support Blodgett.[29] The Tisch Office connected Blodgett with a real estate development attorney, and Blodgett sent the attorney confidential Fairstead information. Blodgett downloaded other confidential Fairstead information to a folder that he labeled "Affordable Education."

In May 2021, Blodgett tasked his two junior team members—Kreinik and Sussi—with creating a financial model for the Separate Company Option. Kreinik downloaded several templates from Fairstead's server to use in creating the model. Kreinik and Sussi secretly worked on the model from May until June 2021. During this period, Blodgett, Kreinik, and Sussi communicated secretly using text messages, personal email, and personal Dropbox accounts.[30]

## G.    Blodgett's Face-To-Face Meetings With Feldman

Blodgett finally met with Feldman on May 21, 2021. In pitching his case for the Restructured Fairstead Option, Blodgett told Feldman that Goldberg was mismanaging the business, that employees disliked Goldberg, and that many employees planned to depart unless leadership changed. Blodgett also told Feldman that he would leave without a restructuring. He demanded that the restructuring

---

[29] Award at 19.

[30] *Id.* at 20.

12

make him a managing member with veto rights, 40% of the equity, and "a path to full control in 10 years."[31]

Feldman thought that was outrageous. When Tatum heard about Feldman's reaction, he panicked. He downloaded 2,300 files from Fairstead's server, including the personal net worth statements for Feldman and Goldberg.[32] To his credit, however, he later realized his mistake and never misused any of it.[33]

A week later, Blodgett downloaded 1,100 more Fairstead files, including pricing models and due diligence checklists.[34] Unlike Tatum, Blodgett had been misusing confidential Fairstead information and sharing it with the Tisch and Sussman Offices.

On June 2, 2021, Blodgett met with Feldman again. He pitched a version of the Restructured Fairstead Option that contemplated Blodgett receiving 80-90% of the new venture, which he would share with other "key employees."[35] That meant Feldman would be reduced from majority holder to a 10-20% holder and receive "no

---

[31] *See Tatum*, 347 A.3d at 1246.

[32] Award at 21.

[33] *Tatum*, 347 A.3d at 1247 (finding that "Tatum made an error in judgment when downloading the information, but he later realized his mistake and did not misuse any of it").

[34] Award at 21.

[35] *Id.*

13

additional consideration." [36] Even that equity stake would "sunset over time."[37] Goldberg would get nothing.[38]

Feldman was shocked. He told Blodgett that he was "not getting the company."[39]

After Feldman's refusal, Blodgett, Tatum, Kreinik, and Sussi decided to leave. The Sussman Office set up a meeting for them with an employment lawyer.[40]

On June 10, 2021, Tatum emailed Goldberg explaining that he planned to leave Fairstead. After getting it, Goldberg instructed Fairstead's IT department to monitor the company's systems for any suspicious downloading activity.[41] On June 16, 2021 Kreinik downloaded 2,800 files from Fairstead's server.

On June 23, 2021, Blodgett sent the Tisch Office the financial model that Kreinik and Sussi had prepared. It contemplated four operating partners: Blodgett, Tatum, Kreinik, and Sussi.[42]

---

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *Id.* at 22.

[41] *See Tatum*, 347 A.3d at 1247.

[42] Award at 21.

14

Blodgett met with Feldman a third time on June 29, 2021. He told Feldman he planned to leave. Feldman responded, "[Y]ou can't have conversations with people in the company about leaving and starting your own company," and "you can't take any employee to work with you including [Tatum]."[43] After the meeting, Goldberg hired Jones Day to investigate what Blodgett and Tatum had been doing.[44]

## H.      Transition Planning

Over the next two months, Blodgett, Tatum, Sussi, and Kreinik worked with Fairstead on developing transition plans.[45] Tatum, Sussi, and Kreinik had non-compete provisions in their employment agreements. Blodgett did not. While the discussions over transition plans were proceeding, Goldberg and Feldman explored how Fairstead might participate in Blodgett's new venture.

On August 4, 2021, Blodgett and Feldman met for a fourth time. They discussed a possible joint venture between Fairstead and Blodgett's new firm.[46]

After the meeting, Blodgett was optimistic that he and his team would depart on good terms. But Feldman and Goldberg refused to make any firm commitments and stalled on finalizing the transition plans. Kreinik, for example, thought there was an agreement for him to resign on September 5, 2021, and be released from his

---

[43] *Id.* at 22; *Tatum*, 347 A.3d at 1248.

[44] *Tatum*, 347 A.3d at 1248.

[45] *Id.*

[46] *Id.*

15

restrictive covenants, but Goldberg told him Fairstead had not definitively agreed to that.[47]

## I. Fairstead Terminates Blodgett.

Matters came to a head on September 12, 2021, when Rodriguez & Wright mistakenly sent an invoice to Blodgett's Fairstead email account. The invoice referred to "Newco Formation."

Goldberg had been monitoring Blodgett's emails since August, and the invoice immediately came to his attention. He inferred that Blodgett intended to start a new company imminently and was not serious about completing a transition plan.

On September 14, 2021, Feldman and Goldberg met with Blodgett. They handed him a letter that terminated him for cause. They also handed him a term sheet for a joint venture between his new entity and Fairstead, but with terms heavily slanted toward Feldman.[48] Blodgett rejected the term sheet and viewed himself as terminated for cause. Even then, Blodgett and Feldman proceeded to negotiate over a potential settlement for months. They never reached agreement.[49]

Blodgett's official termination letter purported to terminate him for "material breaches, which include, without limitation, noncompliance of the Company's policies

---

[47] *Id.*

[48] *Id.* at 1249.

[49] *Id.*

(including the breach of Sections 6 and 11 of the Employment Agreement)."[50] The letter did not provide any specifics. The letter also purported to cancel Blodgett's equity. It only referred to his Employment Agreement. It did not refer to or allege any breach of the LLC agreements governing the various Fairstead entities.

On November 3, 2021, Blodgett launched a new affordable housing venture. Two days later, he informed Fairstead he had started the competing business. Kreinik and Sussi joined Blodgett in his new business. Tatum did not.

## J.    This Litigation

On May 24, 2022, Blodgett filed an arbitration under his Employment Agreement. He sought determinations that he had not breached his Employment Agreement and that Fairstead did not have the right to cancel his equity interests.[51] Blodgett contended that Feldman, Goldberg, and various Fairstead entities breached his Employment Agreement by: (i) terminating him for purported violations of Sections 6 and 11; (ii) canceling his equity interests; and (iii) engaging in a pretextual termination. Blodgett argued that the LLC agreements governing the various Fairstead entities did not authorize the cancellation of his interests. He asserted claims for conversion and unjust enrichment based on the wrongful cancellation of his interests.

---

[50] *See* Blodgett OBX 5.

[51] *See* Blodgett OBX 6.

17

Feldman, Goldberg, and Fairstead replied on June 10, 2022 and indicated they planned to litigate the arbitrability of Blodgett's claims in this court. For nearly two months, however, they did nothing. At the end of July, Blodgett moved to compel arbitration in New York state court to get a response.[52]

On August 1, 2022, two Fairstead entities—Fairstead Capital Management LLC (the "Management Company") and Fairstead Affordable LLC (the "Tax-Credit Company")—filed this lawsuit. The Management Company served as the general partner for special purpose vehicles that deployed capital into affordable housing deals. The Tax-Credit Company operated the tax credit business. Both are Delaware limited liability companies.

To implement Blodgett's right under the Employment Agreement to 15% of Fairstead's carried interest in its deals, Fairstead awarded Blodgett member interests in both the Management Company and the Tax-Credit Company. Fairstead purported to cancel those interests when terminating Blodgett.

Fairstead asserted four counts. Count I contended that Blodgett breached the Management Company's LLC agreement by disclosing and misusing confidential information. Count II sought a declaration that the Management Company properly canceled Blodgett's member interests. Counts III and IV sought similar relief on behalf of the Tax-Credit Company.

---

[52] *See* Blodgett OBX 7.

Initially, the parties disputed whether Fairstead's claims should proceed here or in arbitration. The court held that disputes arising under the Employment Agreement had to be arbitrated but that any claims under their LLC agreements had to proceed in this court. The court stayed this litigation so that the arbitration could go first.

In the arbitration, the parties conducted extensive discovery, and the arbitrator presided over a four-day evidentiary hearing. The parties presented closing arguments in August 2024. Over the course of the arbitration, the parties narrowed their claims. Blodgett ultimately pursued claims for (1) breach of the Employment Agreement; (2) a declaratory judgment that he did not violate Sections 6 and 11 of the Employment Agreement; and (3) breach of the implied covenant of good faith and fair dealing.[53] Fairstead pursued counterclaims for (1) breach of the Employment Agreement; (2) a declaratory judgment that Blodgett was terminated for cause; (3) breach of fiduciary duty; (4) faithless servant; (5) aiding and abetting breaches of fiduciary duty by Tatum and Kreinik; (6) misuse of confidential information; (7) trade secret misappropriation; and (8) tortious interference with Fairstead's employment relationships with Tatum and Kreinik.[54]

---

[53] *See* Award at 2. Blodgett declined to pursue his claim for conversion. *See id.*

[54] Fairstead initially asserted the following additional counterclaims: (1) unlawful trade practices; (2) conversion; (3) unjust enrichment; (4) tortious interference with prospective economic advantage; (5) a claim under the Stored Communications Act; (6) a claim under the Computer Fraud and Abuse Act; and (7) a claim for constructive trust. *See* Blodgett OBX 12. Fairstead confirmed it would no

19

On November 6, 2024, Blodgett moved for summary judgment on Counts II and IV. In a bench ruling issued on February 11, 2025, the court held that the LLC agreements did not authorize the cancellation of Blodgett's equity interests.[55] The court based that interpretation in part on its conclusion that Section 4(d)(2) of the Employment Agreement did not contain affirmative language authorizing the cancellation of Blodgett's equity interests.

## K.     The Award

On April 2, 2025, the arbitrator issued the Award. The arbitrator ruled that the "evidence presented . . . overwhelmingly establishes that Blodgett breached Sections 6(a) and 11 of the Employment Agreement."[56] The arbitrator found that Blodgett did so by "repeatedly and covertly sending (via personal email) Fairstead's confidential or internal information to [the Tisch and Sussman Offices] for what Blodgett called 'private advice' without obtaining the contractually mandated 'prior written consent' and outside the 'ordinary course of his employment . . . .'"[57] The arbitrator concluded Blodgett shared Fairstead's information for the purpose of either

---

longer pursue those claims and the arbitrator held those claims were withdrawn with prejudice. *See* Award at 2.

[55] *See* Ruling Tr. at 17:6–12.

[56] Award at 25.

[57] *Id.* at 26.

20

taking over Fairstead or securing investments for his new venture, not for Fairstead's benefit or for official Fairstead business.[58]

The arbitrator ruled that Blodgett breached Section 11 of the Employment Agreement by sharing internal Fairstead documents.[59] The arbitrator also ruled that Blodgett violated Section 11 through "mass downloading [of] Fairstead materials . . . outside the 'ordinary course of employment' and contrary to [Fairstead's] interests."[60] The arbitrator ruled that Blodgett violated Section 6 of the Employment Agreement because the materials he forwarded via personal email included "internal business plans, internal valuations and financial projections, internal equity plans, and training materials . . . ."[61]

Blodgett had argued that he shared confidential Fairstead information with the Tisch Office on a regular basis such that his actions were not outside the ordinary course. [62] The arbitrator ruled that the "Employment Agreement contains no exception to Sections 6 and 11" that would have permitted those disclosures.[63]

---

[58] *Id.*

[59] *Id.*

[60] *Id.* at 27 (cleaned up).

[61] *Id.*

[62] *Id.* at 28.

[63] *Id.* at 27–28 ("Even assuming some implicit expectation that Blodgett would share information with his Family Offices for purposes of managing his financial affairs, it is inconceivable that the parties understood the Employment Agreement to

The Award also addressed Fairstead's ability to cancel Blodgett's equity interests under Section 4 of the Employment Agreement. The arbitrator declared that "the Employment Agreement does not entitle [Fairstead] to cancel Blodgett's entire interests, but, based upon his termination for breach of Sections 6 and 11, may under the Employment Agreement only forfeit his interests in pending transactions."[64]

The Award further held that Blodgett breached his fiduciary duties as an employee by improperly soliciting Tatum, Kreinik, and Sussi to join in his effort to take over Fairstead and by misappropriating Fairstead's proprietary and confidential information.[65] Otherwise, the arbitrator held that Fairstead failed to prove its counterclaims.[66]

The arbitrator rejected Fairstead's request for damages of $34 million based on Blodgett's failure to pursue a business opportunity.[67] The arbitrator also denied Fairstead's request for damages of $433,989 for fees paid to public relations firms.[68]

---

permit Blodgett to share Fairstead information with his Family Offices or anyone else, without prior authorization and secretly, for the purpose of effecting Blodgett's control of Fairstead or developing proposals for a potentially competing venture." (emphasis in original)).

[64] *Id.* at 29 (emphasis in original).

[65] *Id.* at 29–30.

[66] *Id.* at 30–31.

[67] *Id.* at 32.

[68] Id. at 33.

And the arbitrator denied Fairstead's request for disgorgement of Blodgett's compensation.[69]

## L.     The Cross-Motions For Summary Judgment

After the issuance of the Award, the parties returned to this court. They cross-moved for summary judgment on Counts I and III, where Fairstead claims that Blodgett breached the LLC agreements. Fairstead also asks the court to revisit its earlier interlocutory grant of summary judgment for Blodgett on Counts II and IV, where Fairstead sought declarations that they validly cancelled Blodgett's equity.

## II.     LEGAL ANALYSIS

A court may grant summary judgment only when "there is no genuine issue as to any material fact," and the "moving party is entitled to judgement as a matter of law."[70]

Fairstead seeks summary judgment on the theory that the arbitrator's findings about Blodgett's conduct under the Employment Agreement are preclusive and warrant entering summary judgment on Counts I and III. Fairstead also contends that those findings warrant revisiting the court's prior grant of summary judgment for Blodgett on Counts II and IV.

---

[69] *Id.* at 30.

[70] Ct. Ch. R. 56(a).

## A. Issue Preclusion

The gating issue is whether factual findings in the Award are preclusive. "Issue preclusion (or collateral estoppel) . . . prohibit[s] re-litigation of factual issues previously adjudicated."[71] Under that doctrine, "where a question of fact essential to the judgment is litigated and determined by a valid and final judgment, the determination is conclusive between the same parties in a subsequent case on a different cause of action."[72] An arbitral award operates as a judgment for purposes of issue preclusion.[73]

Under Delaware law, issue preclusion can apply to "rights, questions, or facts."[74] Establishing issue preclusion requires meeting a four-part test: "(1) the issue

---

[71] *Laborers' Dist. Council Constr. Indus. Pens. Fund v. Bensoussan*, 2016 WL 3407708, at *6 (Del. Ch. June 14, 2016) (cleaned up).

[72] *Columbia Cas. Co. v. Playtex FP, Inc.*, 584 A.2d 1214, 1216 (Del. 1991) (quoting *Tyndall v. Tyndall*, 238 A.2d 343, 346 (Del. 1968)); *accord* Restatement (Second) of Judgments, *supra*, § 27; *see Messick*, 655 A.2d at 1211 ("Under the doctrine of collateral estoppel, if a court has decided an issue of fact necessary to its judgment, that decision precludes relitigation of the issue in a suit on a different cause of action involving a party to the first case."). Delaware courts frequently rely on the Restatement when analyzing issue preclusion. *See Columbia Pipeline*, 2021 WL 772562, at *16 (collecting authorities).

[73] *See LG Elec., Inc. v. InterDigital Commc'ns, Inc.*, 98 A.3d 135, 138–39 (Del. Ch. 2014) (collecting authorities), *aff'd*, 114 A.3d 1246 (Del. 2015). Technically, the Award should be confirmed as a judgment before it has preclusive effect. The parties have not insisted on this procedural step and treat the Award as a final judgment.

[74] *PVP Aston, LLC v. Fin. Structures Ltd.*, 2023 WL 2728775, at *7 (Del. Super. Mar. 31, 2023) (quoting *Hercules Inc. v. AIU Ins. Co.*, 783 A.2d 1275, 1276 (Del. 2000) (emphasis added)).

previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action."[75]

The parties do not meaningfully dispute the second, third, or fourth elements.[76] On the first issue, Fairstead argues that the Award is broadly preclusive. Blodgett responds that Fairstead arbitrated against him in his capacity as an employee and that the Award only addressed disputes under the Employment Agreement. He contends that the arbitrator's findings cannot bind him in his capacity as a member for disputes under the LLC agreements.

The first requirement for issue preclusion demands that the issue to which preclusion applies be identical to the issue previously litigated.[77] A ruling on a question of fact or issue of law that is actually and necessarily adjudicated has preclusive effect even in a subsequent suit "based on a different cause of action."[78]

---

[75] *Norman v. State*, 976 A.2d 843, 868 (Del. 2009).

[76] *See* Fairstead OB at 25–27; Blodgett OB at 58.

[77] *Betts v. Townsends, Inc.*, 765 A.2d 531, 535 (Del. 2000).

[78] *PVP Aston, LLC*, 2023 WL 2728775, at *8 (citing *Neoplan USA Corp. v. Taylor*, 604 F. Supp. 1540 (D. Del. 1985)).

*Betts* offers insight. There, an employee who injured his knee while on the job sought worker's compensation. The employee argued that the injury caused temporary total disability, and the review board agreed. One year later, after his condition worsened, the employee sought additional compensation. This time he argued that the injury had caused permanent partial disability. The review board rejected his claim, concluding that arthritis, not the workplace injury, caused his worsened condition. The employee challenged the ruling, claiming the review board was precluded from revisiting its prior finding that the injury caused his disability. The Superior Court rejected that argument, and the Delaware Supreme Court affirmed. The justices explained that "[w]hether an industrial accident caused temporary total disability or permanent partial disability are two totally distinct questions."[79] While the original knee injury was the same, the condition of the knee was different, the connection between the injury and the knee's condition was different, and the resulting determinations were different.

By contrast in *Brown*, an individual charged with federal offenses sought to suppress the government's evidence as resulting from an unconstitutional search.[80] The federal court denied the motion, and the individual was convicted. He later filed a civil petition under state law for the return of money seized during his arrest, again arguing that the search was unconstitutional. The Delaware Supreme Court held

---

[79] *Betts*, 765 A.2d at 535.

[80] *Brown v. State*, 721 A.2d 1263, 1264 (Del. 1998).

that the district court's ruling on the lawfulness of the search was preclusive for purposes of the civil action for return of property.[81] Even though the causes of action were different—one civil and one criminal—the issue was the same.

*Goldman Sachs* is another illustrative decision.[82] There, the Territory for the United States Virgin Islands sought to recover damages for a polluted aquifer. The Territory first sued a defunct corporation and two of its officers and directors in federal court. During that litigation, the federal court held that the time to sue the defunct corporation had expired. The Territory later sued Goldman Sachs in state court for unjust enrichment. The Court of Chancery held that the unjust enrichment theory required a threshold claim against the defunct entity and that the federal ruling on the Territory's ability to sue precluded that claim. The Territory had been too late to sue on behalf of the defunct corporation in federal court, and the same was true for purposes of a different claim against a different defendant in state court.[83] The legal issue was identical, even though the claims were different.

---

[81] *Id.* at 1265.

[82] *Territory of U.S. Virgin Islands v. Goldman, Sachs & Co.*, 937 A.2d 760 (Del. Ch. 2007), *aff'd,* 956 A.2d 32 (Del. 2008)

[83] *Id.* at 787 (explaining that the prior judgement has "a preclusive effect as to the narrower, and less controversial, issue of whether a judgment can be obtained against Panex. As to that narrow issue, the Virgin Islands had its turn at bat and swung and missed. The holding of the Third Circuit that Panex's ability to be sued expired three years after its dissolution, per the clear and unambiguous words of § 278, is binding against the Virgin Islands.").

In this case, the factual determinations that the arbitrator made are binding. The parties arbitrated whether Blodgett acted in his own self-interest, took confidential information, disclosed it to third parties, and improperly solicited Fairstead employees. Those determinations turned on what Blodgett did and why. They bind the parties to the arbitration and have preclusive effect in later proceedings, including this one.

The implications of those factual findings depend on the claim being asserted. The same facts may generate liability under one cause of action but not another. A party's later suit on a different cause of action, however, does not allow a court to revisit a binding factual finding. The factual issues in the arbitration and in this case are identical, so preclusion applies.

To argue for a different result, Blodgett points to the *Tatum* decision, where the court distinguished between actions Tatum took as an employee and actions he took as a member. That distinction mattered in *Tatum* for purposes of the legal implications of the findings. The distinction did not affect the findings about what Tatum did.

The same is true here. The arbitrator's *legal* conclusion that Blodgett breached Sections 6 and 11 of the Employment Agreement is not preclusive for purposes of whether he breached provisions in the LLC agreements. The arbitrator's factual findings, however, are preclusive and must form the basis of the court's analysis of breach.

**B. Counts I And III: Breach Of The LLC Agreements**

Fairstead contends that Blodgett breached provisions in the LLC agreements. The agreements are substantively identical, so this decision refers singularly to the Management Company's LLC agreement. The facts found in the Award do not establish breach for two reasons. First, they show that Blodgett acted as an employee, not as a member. Second, they show that Fairstead is not entitled to any additional remedy.

To prevail on a breach of contract claim, the claimant must prove "(i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) a causally related injury that warrants a remedy, such as damages . . . ."[84] When determining the scope of a contractual obligation, "the role of a court is to effectuate the parties' intent."[85] Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[86] "Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning."[87]

---

[84] *AB Stable VIII LLC v. Maps Hotels and Resorts One LLC*, 2020 WL 7024929, at *47 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021).

[85] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[86] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (citations omitted).

[87] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) (citations omitted).

## 1. The Confidentiality Provision.

Fairstead argues Blodgett breached Section 8.3(b) of the LLC agreement (the "Confidentiality Provision") by sharing information with the Tisch and Sussman Offices. The factual findings in the Award establish that Blodgett shared information, but they also establish that he did so as an employee, not as a member. Blodgett did not take any separate or additional action as a member that could implicate his member-related obligations.

> The Confidentiality Provision states:

> At all times after the date hereof, no Member or any of its Affiliates shall disclose or use any confidential information of or with respect to the Company or its business; <u>provided</u> that such obligation shall not apply to any information (i) to the extent that it legally is or becomes part of public or industry knowledge from authorized sources other than a Member or any affiliate of any Member; (ii) which the Member or any of its Affiliates is required by law to disclose . . ., or (iii) in case of any use by the Members, such use is necessary or appropriate in the conduct of the Company's business.[88]

The Confidentiality Provision does not define "confidential information." If the LLC agreement stood in isolation, the court would interpret the Confidentiality Provision in accordance with its plain meaning.[89] Here, however, the Confidentiality Provision exists and operates in conjunction with the Employment Agreement, so principles of

---

[88] Blodgett OBX 4 (cited as LLCA) § 8.3(b).

[89] *Zurich Am. Ins. Co. v. Syngenta Crop Protection LLC*, 314 A.3d 665, 675–76 (Del. 2024) ("Absent ambiguity, contract terms should be accorded their plain and ordinary meaning.").

contract law call for giving the term a consistent reading. [90] The Employment Agreement defines "confidential information" in exceedingly broad terms. [91] Using the Employment Agreement's definition maintains consistency across the interrelated agreements.

The arbitrator found that Blodgett downloaded and shared materials falling within the Employment Agreement's definition of confidential. That finding has preclusive effect.

Blodgett argues initially that he did not breach the Confidentiality Provision because exception (iii) permits a member to use confidential information if "such use

---

[90] *CA, Inc. v. Ingres Corp.*, 2009 WL 4575009, at \*47 (Del. Ch. Dec. 7, 2009) ("Traditionally, courts try to give a consistent reading to interrelated agreements.").

[91] EA § 6(a) ("[A]ll information, whether oral or written, which is indicated to be confidential by Employer when it is disclosed to the Employee or, even if not so indicated, information, whether oral or written, respecting Employer's or its affiliates' or related entities' business including, but not limited to, purchase strategies, financing strategies, joint venture terms, pending deals, partners and joint venturers, its trading and/or order execution techniques, methods and/or strategies; computer programs, software and data; computational algorithms, procedures, methods and/or techniques; training procedures; clearing operations; business plans and ideas; marketing techniques or strategies; products and product lines; pricing policies; trade secrets; cost information; commercial relationships; customers; financial results and projections (including, without limitation, the profitability of Employer's products and product lines); research and development activities and results; the identity and/or profitability of Employer's traders and/or any other information that could reasonably be expected to prove harmful to Employer if disclosed to third parties (including, but not limited to, any formation that could reasonably be expected to aid a competitor of Employer vis a vis Employer, its affiliates or related entities). "Confidential Information" also includes all information as to which Employer owes an obligation of confidentiality to a third party (including, but not limited to, computer-related vendors (hardware and software)).").

is necessary or appropriate in the conduct of the Company's business" (the "Necessary-Or-Appropriate Exception"). Unlike the Confidentiality Provision, the Employment Agreement only permits sharing with Fairstead's consent. When holding that Blodgett breached the confidentiality restrictions in the Employment Agreement, the arbitrator emphasized that Blodgett shared confidential information without Fairstead's consent. That is not dispositive for the Confidentiality Provision.

The factual findings in the Award nevertheless preclude Blodgett from relying on the Necessary-Or-Appropriate Exception. Blodgett argued that he routinely discussed and shared Fairstead information with the Tisch Office because that office managed his finances, oversaw his personal investments, and prepared his tax returns.[92] That argument does not address sharing with the Sussman Office. It also does not meet the test set forth in the Necessary-Or-Appropriate Exception. That exception requires that the use be necessary or appropriate for Fairstead's business, not necessary or appropriate for Blodgett.

At any rate, the arbitrator found that the record did not support Blodgett's claim about routine communications with the Tisch Office.[93] The arbitrator also found that Blodgett did not share information because it was necessary or

---

[92] Award at 27–28.

[93] *Id.* at 28.

appropriate for Fairstead's business, but in furtherance of his own plans and not in the ordinary course of business.[94]

Blodgett fares better, however, when arguing that he did not disclose or use any confidential information in his capacity as a member. The LLC agreement defines "Member" as simply "the members set forth on Schedule I attached hereto . . . and each other Person who becomes a Member in accordance with this Agreement."[95] Although the LLC agreement states that "[t]he property, business and affairs of the Company shall be managed by the Members," the LLC agreement requires that "[a]ll actions of the Company shall be authorized in accordance with Section 6.5(d) below."[96] That section provides that "if a quorum is present, the affirmative vote of a Majority in Interest present and entitled to vote on, or take action with respect to, any matter shall be the act of the Members."[97] The prior subsection states that unless the agreement provides otherwise, "the presence of a Majority in Interest . . . shall constitute a quorum . . . ."[98] As the holder of a 15% interest, Blodgett could not establish a quorum or take action as a member.

---

[94] *See id.* at 26.

[95] LLCA Preamble.

[96] *Id.* § 5.1.

[97] *Id.* § 6.5(d).

[98] *Id.* § 6.5(c).

Instead, the LLC agreement contemplates that the members "may from time to time designate such officers, agents and managers as they may deem necessary to carry out the day-to-day operations of the Company."[99] Blodgett was empowered as an employee to act as the Management Company's agent. The actions he took were therefore governed by his Employment Agreement, not the LLC agreement.

That is not only true as a legal matter, but also as a factual matter. Everything Blodgett did on which Fairstead now relies was conduct he took as an employee. In his capacity as a member, Blodgett was a minority owner in a holding company. He did not obtain, generate, or share information in his capacity as a minority investor in a holding company, such as by seeking and obtaining books and records. He obtained, generated, and shared information in his capacity as an employee responsible for the day-to-day operation of Fairstead's business.

Drawing this type of distinction is critical to the integrity of Delaware law. Lawyers have developed and deployed a now-widespread technology of inserting employment-related terms into the internal governance documents of Delaware entities. Businesses and their lawyers do that so they can invoke Delaware's contractarian regime and argue that the terms override how other jurisdictions regulate employment relationships. That legal technology calls on Delaware courts to adjudicate employment disputes for the country and potentially the world. For example, in the past five years alone, the Court of Chancery has issued written

---

[99] *Id.* § 5.2.

decisions addressing disputes over restrictive covenants for companies located in or with employees working in Hong Kong, [100] Italy, [101] Alabama, [102] California, [103] Florida, [104] Idaho, [105] Illinois, [106] Louisiana, [107] New York, [108] Oklahoma, [109]

---

[100] *Ainslie v. Cantor Fitzgerald, L.P.*, 2023 WL 106924 (Del. Ch. Jan. 4, 2023), *rev'd and remanded,* 312 A.3d 674 (Del. 2024).

[101] *AlixPartners, LLP v. Mori*, 2022 WL 1111404 (Del. Ch. Apr. 14, 2022).

[102] *Daxco, LLC v. Timm*, 2026 WL 172862 (Del. Ch. Jan. 22, 2026); *HighTower Hldg., LLC v. Gibson*, 2023 WL 1856651 (Del. Ch. Feb. 9, 2023).

[103] *Gener8, LLC v. Castanon*, 2023 WL 6381635 (Del. Ch. Sept. 29, 2023); *Sorrento Therapeutics, Inc. v. Mack*, 2023 WL 5670689 (Del. Ch. Sept. 1, 2023); *UBEO Hldgs., LLC v. Drakulic*, 2021 WL 1716966 (Del. Ch. Apr. 30, 2021).

[104] *BankUnited, N.A. v. Shulick*, 2026 WL 21637 (Del. Ch. Jan. 2, 2026); *Naples Ctr. For Dermatology & Cosmetic Surgery, PA v. Trisan*, 2025 WL 1276207 (Del. Ch. May 2, 2025).

[105] *Kodiak Bldg. P'rs, LLC v. Adams*, 2022 WL 5240507 (Del. Ch. Oct. 6, 2022).

[106] *Hub Gp., Inc. v. Knoll*, 2024 WL 3453863 (Del. Ch. July 18, 2024); *Centurion Serv. Gp., LLC v. Wilensky*, 2023 WL 5624156 (Del. Ch. Aug. 31, 2023).

[107] *AG Res. Hldgs., LLC v. Terral*, 2021 WL 486831 (Del. Ch. Feb. 10, 2021).

[108] *N. Am. Fire Ultimate Hldgs., LP v. Doorly*, 2025 WL 736624 (Del. Ch. Mar. 7, 2025); *Kuramo Cap. Mgmt., LLC v. Seruma*, 2024 WL 1888216 (Del. Ch. Apr. 30, 2024); *Brown v. Ct. Square Cap. Mgmt., L.P.*, 2023 WL 8665122 (Dec. 15, 2023); *Intertek Testing Servs. NA, Inc. v. Eastman*, 2023 WL 2544236 (Del. Ch. Mar. 16, 2023).

[109] *Parks v. Horizon Hldgs.*, LLC, 2022 WL 2821337 (Del. Ch. July 20, 2022).

Pennsylvania, [110] South Carolina, [111] Texas, [112] Utah, [113] Washington, [114] and Wisconsin. [115] That list excludes orders and transcript rulings. [116] It also excludes decisions addressing restrictive covenants related to sales of businesses.

For Delaware courts to address these matters is problematic because the Delaware franchise depends on other states deferring to Delaware law to govern the internal affairs of the entities that Delaware charters. Delaware risks jeopardizing that deference if it accommodates efforts to use the internal governance documents of Delaware entities to override the law of other states on issues of great importance to them. [117]

---

[110] *Frontline Techs. Parent, LLC v. Murphy*, 2023 WL 5424802 (Del. Ch. Aug. 23, 2023).

[111] *Fortiline, Inc. v. McCall*, 341 A.3d 1027 (Del. Ch. 2025), *aff'd*, — A.3d —, 2026 WL 369934 (Del. Feb. 10, 2026).

[112] *Kalkomey Enters., LLC v. Strobl*, 2026 WL 129295 (Del. Ch. Jan. 16, 2026); *Sunder Energy, LLC v. Jackson*, 305 A.3d 723 (Del. Ch. 2023), *aff'd in part, rev'd in part,* 332 A.3d 472 (Del. 2024); *U.S. Legal Support, Inc. v. Lucido*, 2021 WL 4940823 (Del. Ch. Oct. 22, 2021).

[113] *ZAGG, Inc. v. Keogh*, 2025 WL 1025013 (Del. Ch. Apr. 7, 2025).

[114] *Payscale Inc. v. Norman*, 2025 WL 1622341 (Del. Ch. June 9, 2025), *rev'd and remanded,* 2026 WL 774876 (Del. Mar. 19, 2026).

[115] *Weil Hldgs. II, LLC v. Alexander*, 2025 WL 689191 (Del. Ch. Mar. 4, 2025), *aff'd,* 350 A.3d 640 (Del. 2025).

[116] A search for non-compete! non-solicit! and "restrictive covenant" limited to Court of Chancery cases between 2021 and 2026 generates 180 results.

[117] See *Diedenhofen-Lennartz v. Diedenhofen*, 931 A.2d 439, 451–52 (Del. Ch. 2007) ("If we expect that other sovereigns will respect our state's overriding interest

36

Delaware can stay within its lane by carefully distinguishing between (1) conduct by employees in their capacities as employees that should not implicate restrictions in constitutive entity agreements and (2) conduct by investors in their capacities as investors that properly implicates those restrictions.[118] There inevitably

in the interpretation and enforcement of our entity laws, we must show reciprocal respect.").

[118] *E.g.*, *Focus Fin. P'rs, LLC v. Holsopple*, 241 A.3d 784, 809 (Del. Ch. 2020) (distinguishing between provisions in unit agreement that govern transfer of units and other equity-related features and employment-related provisions that ordinarily would be found in an employment agreement); *cf. Carr v. Glob. Payments Inc.,* 2019 WL 6726214, at *6 (Del. Ch. Dec. 11, 2019) (making capacity distinctions for purposes of advancement), *aff'd*, 227 A.3d 555 (Del. 2020); *James v. Williams*, 2017 WL 5900953, at *3–4 (Del. Super. Nov. 30, 2017) (assessing whether defendant acted in a "managerial capacity"); *Vichi v. Koninklijke Philips Elecs. N.V.,* 2009 WL 4345724, at *6 (Del. Ch. Dec. 1, 2009) (evaluating existence of personal jurisdiction based on whether individual acted as an employee or in a different capacity); *see generally* Ann M. Lipton, *Inside Out (or, One State to Rule Them All): New Challenges to the Internal Affairs Doctrine*, 58 Wake Forest L. Rev. 321, 369–91 (2023) (discussing complications of using entity agreements to regulate employment relationships and dangers of invoking Delaware law and the internal affairs doctrine for that purpose); Mohsen Manesh, *The Corporate Contract and the Internal Affairs Doctrine*, 71 Am. U. L. Rev. 501, 556–57 (2021) ("The use of the corporate contract to regulate the employer-employee relationship, for example by restricting an employee- shareholder's right to compete against the corporation's business, would represent a paradigm shift in the reach of corporate law. Moreover, it would create an insoluble conflict between Delaware law and the law of other jurisdictions that strictly limit the scope and enforceability of non-compete covenants (most notably California, where many Delaware corporations are headquartered). If Delaware courts were to enforce such employment-related provisions in the corporate contract against employee-shareholders, despite the conflict it would pose to the laws of other states, it could prompt a regulatory turf war among states that might ultimately undermine the 'protective boundaries' of the internal affairs doctrine. Delaware courts, however, could avoid such conflicts. Because employment-related provisions lie within the Outer Band and beyond the internal affairs doctrine, Delaware courts, deploying traditional choice-of-law analysis, could defer to the laws of other states when evaluating employment-related provisions. Doing so would effectively limit the scope

will be borderline cases that require judgment. Envision, for example, a small business that elects to operate as a member-managed LLC, builds all of the internal-governance mechanics and employment-related provisions into the LLC, and then operates under the LLC agreement, without entering into separate employment agreements or other more specific contracts. In that setting, there would be no reason to parse the roles or capacities in which the principals acted, and employment-related provisions in an LLC agreement could well apply.

This is not that case. Blodgett entered into the LLC agreement with Feldman and Goldberg (through their affiliates), but Fairstead separately entered into the Employment Agreement with Blodgett to govern his actions as an employee. Fairstead has not pointed to anything that Blodgett did as a member as opposed to as an employee. The arbitrator addressed conduct that Blodgett took as an employee under the agreement that specifically governed his actions as an employee.

Blodgett did not engage in any activity that implicates the LLC agreement. Blodgett therefore did not breach the Confidentiality Provision.

### 2. The Good Faith Provision.

Fairstead separately argues that Blodgett breached Section 6.11 of the LLC agreement (the "Good Faith Provision") by developing the Restructured Fairstead

---

of the Outer Band as it applies to employee matters and avoid a heedless clash with the laws of other states." (footnotes omitted)); Mohsen Manesh, *The Contested Edges of Internal Affairs*, 87 Tenn. L. Rev. 251, 252 (2020) (explaining that an expansive approach to the internal affairs doctrine "could have disastrous consequences for Delaware corporate law").

and Separate Company Options for his own benefit. The distinction between Blodgett's actions as an employee and his actions as a member again forecloses Fairstead's claim.

The Good Faith Provision addresses the duties that members owe to each other and to the LLC. The LLC agreement first strips away all fiduciary duties. It then substitutes a contractual commitment under which each member must "act honestly and in good faith in its dealings with the Company and its Members . . ."[119] In its entirety, the provision states:

> 6.11 <u>No Fiduciary Duty; No Duty of Loyalty.</u>
>
> (a) Except as expressly provided elsewhere in this Agreement or required by the Act or other applicable law, a Member is permitted to act solely in the best interests of such Member and shall not have any fiduciary duty (including any duty of loyalty) or other obligation to act in the best interests of the Company or its Members as a whole.
>
> (b) Notwithstanding the provisions of Section 6.11(a), each Member shall: (i) act honestly and in good faith in its dealings with the Company and the Members; (ii) account to the Company, and hold as its trustee, any property, profit or benefit derived in the conduct or winding up of the Company's business or from the use of Company property, including the appropriation of Company properties; and (iii) refrain from dealing with the Company in the conduct or winding up of the Company's business as or on behalf of a party having an interest adverse to the Company.[120]

The resulting obligation to act in good faith is a contractual one. Even when a court looks to fiduciary duties to give content to what it means to act in good faith, the

---

[119] LLCA § 6.11(b).

[120] *Id.* § 6.11.

obligation remains contractual.[121] The plaintiff must prove a claim for breach of

contract; fiduciary standards of review do not apply.[122]

"[W]hen a contract's express terms incorporate a good faith requirement, the

trial court should focus on the meaning of that express contractual duty."[123] When

interpreting an unadorned obligation to act in good faith, Delaware decisions apply a

subjective test.[124] When the agreement uses an objective modifier like "reasonable,"

---

[121] *See, e.g.*, *CelestialRX Invs., LLC v. Krivulka*, 2017 WL 416990, at *16 (Del. Ch. Jan. 31, 2017) (where LLC agreement eliminated fiduciary duties but imposed liability for bad faith actions and improper self-dealing, "[t]hose duties are contractual in nature, but to the extent they employ undefined terms such as 'bad faith,' the common law fiduciary duties are instructive in supplying the definition").

[122] *In re El Paso Pipeline P'rs, L.P. Deriv. Litig.*, 2014 WL 2768782, at *19 (Del. Ch. June 12, 2014) ("Because the LP Agreement eliminates all fiduciary duties, the fiduciary duty precedents do not control.").

[123] *ev3, Inc. v. Lesh*, 114 A.3d 527, 539 (Del. 2014).

[124] *See Exit Strategy, LLC v. Festival Retail Fund BH, L.P.*, 2023 WL 4571932, at *9 (Del. Ch. July 17, 2023) ("When a partnership agreement replaces fiduciary duties with a contractual duty to act with a 'good faith belief' that the challenged action is in the partnership's best interests, the standard governing breach is 'subjective bad faith.'"); *Dieckman v. Regency GP LP*, 2021 WL 537325, at *17 (Del. Ch. Feb. 15, 2021), *aff'd*, 264 A.3d 641 (Del. 2021) ("As our case law makes clear, the use of the unmodified verb 'believe' in the definition of 'good faith' in [the LP agreement] means that the good faith standard in the LP Agreement is subjective and not objective."); *Morris v. Spectra Energy P'rs (De) GP, LP*, 2017 WL 2774559, at *6 (Del. Ch. June 27, 2017) (interpreting a limited partnership agreement's good faith obligation to require "the person acting [to] believe that the determination or other action is in the best interests of the Partnership" and concluding that creates a "subjective good faith" standard); *Fox v. CDX Hldgs., Inc.*, 2015 WL 4571398, at *25 (Del. Ch. July 28, 2015) ("When a contract governed by Delaware law calls upon a party to act or make a determination in good faith, without any qualifier, it means that the party must act in subjective good faith."), *aff'd*, 141 A.3d 1037 (Del. 2016); *see also Mehra v. Teller*, 2021 WL 300352, at *24 (Del. Ch. Jan. 29, 2021) (citations

40

then decisions require subjective good faith that is objectively reasonable.[125] Here, there is no qualifying language, so the standard is subjective.

To satisfy a subjective good faith standard, a member must act to promote the best interests of the company and must believe that he is doing so.[126] But the LLC agreement contains another, more specific provision that authorizes members to compete with the Company (the "Competition Provision"). It states:

> The Members shall not be required to devote their full time to the business of the Company and shall only be required to devote such time as they deem appropriate in their discretion. The Members and their Affiliates, and their respective officers, directors, employees, stockholders, members (including managing members) and partners may have other business interests and may engage in other activities in addition to those relating to the Company, in each case, whether or not those businesses or activities compete with the business of the Company, and (i) the pursuit of those businesses or activities shall not constitute a breach of this Agreement or result in a breach of any duties or obligations to the Members hereunder, (ii) and there shall be no obligation on the part of any such Person to provide the Company or any Member with the opportunity to participate in such business or activity. Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other investments or

---

omitted) ("The Delaware Supreme Court has held that contractual good faith is a subjective standard applied at the time the decision was made.").

[125] *Brinckerhoff v. Enbridge Energy Co., Inc.*, 159 A.3d 242, 260 (Del. 2017) (explaining that "the use of the qualifier 'reasonably' imposes an objective standard of good faith"); *accord Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 361 n.34 (Del. 2013) ("The LP Agreement's addition of the term 'reasonably' distinguishes it from limited partnership agreements that Delaware courts have interpreted as establishing a purely subjective good faith standard."); *In re Kinder Morgan Inc. Corp. Reorg. Litig.*, 2015 WL 4975270, at *5 (Del. Ch. Aug. 20, 2015) (same).

[126] *Exit Strategy, LLC*, 2023 WL 4571932, at *9 (citing *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 106 (Del. 2013)).

activities of any other Member or any income or revenues derived therefrom.[127]

The Competition Provision necessarily limits the Good Faith Provision, because a member who pursues a business that competes with the company would have difficulty believing that those actions served the best interests of the company.

The interactions between the Good Faith Provision and the Competition Provision reinforce the distinction, discussed in the prior section, between what a member can do *qua* member and what an employee can do *qua* employee. An employee is an agent who owes fiduciary duties to the company and must serve the company's best interests.[128] The Good Faith Provision makes clear that members are *not* fiduciaries, and the Competition Provision shows that members need not always pursue the Company's best interests.

---

[127] LLCA § 8.3(a) (recognizing that members are "not required to devote their full time to the business").

[128] Restatement (Third) of Agency § 7.07(3)(a) (A.L.I. 2006), Westlaw (database updated Oct. 2024) ("[A]n employee is an agent whose principal controls or has the right to control the manner and means of the agent's performance of work . . . ."); *accord* Restatement (Second) of Agency § 429 (A.L.I. 1958), Westlaw (database updated Oct. 2024) ("The rules as to the duties and liabilities to the principal of agents who are not servants apply to servants."); Restatement (First) of Agency § 2 cmt. a (A.L.I. 1933), Westlaw (database updated Oct. 2024) ("A master is a species of principal, and a servant is a species of agent. The words 'master' and 'servant' are herein used to indicate the relationship from which arises the tort liability of an employer to third persons for the tort of an employee . . . ."). *See* Restatement (Second) of Agency, *supra*, Index M100 ("A master is a principal; a servant is an agent with special powers and rights additional to those of agents not servants. Hence all the rules applicable to principal and agent apply to master and servant . . . .").

As with the Confidentiality Provision, analyzing whether Blodgett breached the Good Faith Provision requires assessing whether he acted as a Fairstead employee or as a minority investor in the LLC. When Blodgett directed his subordinates—Kreinik and Sussi—to prepare a financial model for the Separate Company Option, he gave them instructions as an employee who supervised more junior employees. When Blodgett used Fairstead information to develop the Restructured Fairstead Option and the Separate Company Option, he accessed that information as an employee. Blodgett's actions did not implicate his role as the holder of a 15% member interest.

Even as an employee, much of Blodgett's conduct would not be problematic under Delaware law. Delaware law does not regard it as a breach of duty for employees to threaten to resign if their demands are not met, even if they warn that their resignations could ruin the business.[129] Delaware courts also recognize a privilege for departing employees to "prepare or make arrangements to compete with their employers prior to leaving . . . without fear of incurring liability for breach of their fiduciary duty of loyalty."[130] Exceptions to this privilege include situations "where the employee has committed some fraudulent, unfair or wrongful act."[131]

---

[129] See *Lazard Debt Recovery GP v. Weinstock*, 864 A.2d 955, 958–59 (Del. Ch. 2004).

[130] *Sci. Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 963, 965 (Del. 1980) (citations omitted).

[131] *Id.* at 965 (citations and quotation marks omitted).

Examples include misappropriating trade secrets, misusing confidential information, soliciting customers before ceasing employment, conspiring to bring about mass resignation of key employees, or usurping an employer's business opportunity.[132] And Delaware courts have reached those holdings when viewing conduct through the prism of the duty of loyalty, which is more protective than contract law.[133]

Here, however, Blodgett used confidential Fairstead information and resources to prepare to compete and when instructing his subordinates to develop a financial model. Even under Delaware law, therefore, Blodgett would have breached his fiduciary duties *as an employee*. But those principles govern Blodgett's conduct as an employee, not his conduct as a member. Blodgett did not engage in any activity that implicates the LLC agreement. He therefore did not breach the Good Faith Provision.

### 3. Remedies

Fairstead's claim for breach also fails because Fairstead has not pointed to a separate harm that Fairstead suffered. Any remedy would be duplicative of what Fairstead obtained in the arbitration.

Fairstead argues that Blodgett's alleged breaches of the Confidentiality Provision and the Good Faith Provision should result in meaningful remedies, including disgorgement and restitution, in addition to what the arbitrator awarded,

---

[132] *Id.* (citations omitted).

[133] *Lonergan v. EPE Hldgs., LLC*, 5 A.3d 1008, 1018 (Del. Ch. 2010) ("When parties exercise the authority provided by [statute] to eliminate fiduciary duties, they take away the most powerful of a court's remedial and gap-filling powers.").

but Fairstead was only harmed once by Blodgett's actions. The arbitrator already addressed that harm by parsing the remedies that Fairstead requested, awarding some, and denying others. Fairstead has not pointed to any separate or additional injury Fairstead could have suffered from a breach of the LLC agreement that is distinct from the already-remedied injuries that Blodgett caused as an employee. Blodgett did not take action as an employee who inflicted some quantum of harm, then as a member that inflicted a different quantum of harm. Blodgett acted, and the Award addressed the harm Blodgett's conduct caused.

To recover in this action, Fairstead would have to prove that Blodgett's conduct as a member resulted in some distinct and compensable injury separate and apart from Blodgett's conduct as an employee. Or Fairstead would have to show that a breach of the LLC agreement triggered some specific, non-duplicative contractual remedy. Fairstead has done neither.

### 4. Summing Up Counts I And III

Summary judgment is granted in favor of Blodgett on Counts I and III. Blodgett did not take any action as a member that could support a breach of the Confidentiality Provision or the Good Faith Provision. Nor is there any separate harm requiring a remedy.

## C. Counts II And IV: Forfeiture Of Blodgett's Equity Interests

Fairstead next argues that the Award compels a different outcome on Counts II and IV, where Fairstead seeks a ruling confirming that they properly cancelled all

45

of Blodgett's equity interests.[134] The court previously held that Section 3.6(b) of the LLC agreement does not permit forfeiture.[135] In reaching that conclusion, the court reasoned in part that Section 4(d)(2) of the Employment Agreement contained no affirmative language authorizing forfeiture. The arbitrator has now determined that Section 4(d)(2) of the Employment Agreement permits the forfeiture of Blodgett's interests in pending transactions, but not Blodgett's other interests.[136] This court's interpretation of the LLC agreement already accommodates that outcome. To the extent there is any doubt, the court modifies its prior holding to make that accommodation explicit.

Section 3.6 of the LLC agreement first states that "[t]he interest held by William Blodgett as of the date hereof shall be treated as a 'promote' or 'carried interest' in exchange for his services as any employee to one or more Affiliates of the Company."[137] The section then addresses what happens to the interests if Blodgett departs from Fairstead.

> Notwithstanding anything contained in this Section 3.6 to the contrary, (a) solely if Mr. Blodgett terminates his employment with any Affiliate of the Company for any reason within 12 months following the closing of the acquisition of any real property by an Affiliate of the Company,

---

[134] Counterclaims I and II are the inverse of Counts II and IV. By securing a ruling in his favor on Counts II and IV, Blodgett also prevailed on Counterclaims I and II.

[135] *See generally* Ruling Tr.

[136] Award at 29.

[137] *See* LLCA § 3.6.

46

then the Company has the option, not the obligation, to cancel any portion of or all Interests then held by Mr. Blodgett effective as of the date of such termination of employment or any date thereafter such that no Net Profits and Net Losses attributable to such property would be allocated and no distributions attributable to such property would be made to Mr. Blodgett, and (b) if any Affiliate of the Company terminates Mr. Blodgett's employment for any reason other than as a result of his unauthorized disclosure of certain proprietary information of such Affiliate or his noncompliance of such Affiliate's policies (including, for the avoidance of doubt, his breach of Section 6 or 11 of that certain Employment Agreement dated as of October 25, 2013 by and between Fortitude Realty Management LLC and Mr. Blodgett), no Interest held by Mr. Blodgett shall be forfeited or canceled. Any distributions to which Mr. Blodgett would otherwise have been entitled pursuant to any canceled Interest shall be allocated to all other Interest Holders, pro rata, based on their Interests (excluding Mr. Blodgett). For the avoidance of doubt, (i) if Mr. Blodgett acquires any additional Interest as a result of Additional Capital Contributions or a Transfer by another Member, such Interest shall not be subject to the provisions in this Section 3.6, and (ii) this Section 3.6 shall not in any way restrict the repurchase right of a Majority in Interest set forth in Section 8.7.[138]

The LLC agreement defines "Interest" as "any of an Economic Interest, Management Interest and/or Membership Interest."[139]

The applicable language appears in subpart (b). That subpart establishes a general rule of non-forfeiture by stating: "[I]f any Affiliate of the Company terminates Mr. Blodgett's employment for any reason . . ., no Interest held by Mr. Blodgett shall be forfeited or canceled." Nested within the general rule of non-forfeiture is an exception that applies if he is terminated "as a result of his unauthorized disclosure of certain proprietary information of such Affiliate or his noncompliance of such

---

[138] *Id.*

[139] *Id.* Art. II.

47

Affiliate's policies (including, for the avoidance of doubt, his breach of Section 6 or 11 of that certain Employment Agreement dated as of October 25, 2013 by and between Fortitude Realty Management LLC and Mr. Blodgett)."

Notably, the exception to the non-forfeiture principle does not give Fairstead an affirmative forfeiture right. Ther is no language in Section 3.6(b) that says in words or substance that "the Company can forfeit Mr. Blodgett's interests under the following circumstances." Instead, the exception recognizes a situation in which the general rule of non-forfeiture does not apply. That exception creates space for some other forfeiture right—to the extent one exists—to operate. Without that space, a forfeiture right that existed under some different source of authority or other agreement would collide with the general rule of non-forfeiture.

The court previously granted summary judgment for Blodgett on Counts II and IV, holding that Section 3.6(b) did not contain an affirmative forfeiture right. That remains true. The plain language of that provision does not contain an affirmative forfeiture right.

In reaching this conclusion, the court observed that Section 4(d)(2) of the Employment Agreement also lacks any language giving Fairstead an affirmative forfeiture right. The arbitrator has now held that Section 4(d)(2) of the Employment Agreement "does not entitle [Fairstead] to cancel Blodgett's entire interests," but Fairstead could "forfeit his interests in pending transactions."[140]

---

[140] Award at 29.

That holding is binding on the parties and has issue preclusive effect for purposes of the Employment Agreement. It means that in the scenario contemplated by the exception to the non-forfeiture principle, the Employment Agreement's limited forfeiture right can operate. The general non-forfeiture principle in Section 3.6(b) of the LLC agreement does not conflict with or foreclose that limited forfeiture right. Section 4 of the Employment Agreement and Section 3.6(b) of the LLC agreement thus work together harmoniously.

Fairstead wants the court to go further and hold that Section 3.6(b) of the LLC agreement grants Fairstead the right to forfeit all of Blodgett's equity interests in their entirety, beyond what the Award construes Section 4 of the Employment Agreement to permit. There is no basis for such a ruling. To reiterate, Section 3.6(b) of the LLC agreement lacks any affirmative language empowering Fairstead to cancel or forfeit Blodgett's interests in the event of termination. The agreement contains an exception to the non-forfeiture principle for certain types of terminations, but that exception only creates a window through which some other forfeiture right—like the right under the Employment Agreement—can operate. It does not give rise to an independent forfeiture right.

Fairstead points out that the court viewed the Employment Agreement as not containing any affirmative forfeiture language either, and the arbitrator has now ruled otherwise. That is the arbitrator's purview. The arbitrator lacks jurisdiction to interpret the LLC agreement. Nor can the arbitrator's interpretation of the Employment Agreement revise the LLC agreement to supply the type of affirmative

49

forfeiture language that would be necessary to establish an independent forfeiture right under the LLC agreement.

The court does not believe that its earlier ruling conflicts with the Award. The court ruled on the scope of Section 3.6(b) of the LLC agreement. The Employment Agreement has always been the arbitrator's domain. That the court held that Section 3.6(b) of the LLC agreement did not give rise to a forfeiture right did not foreclose the arbitrator from interpreting the Employment Agreement to establish a forfeiture right. The window-creating exception to Section 3.6(b) of the LLC agreement allows that right to operate. To the extent there is confusion about whether the court's prior ruling conflicts with the Award's conclusion, the court has now made the interrelationship plain. The same reasoning applies to the Tax-Benefit Company's LLC agreement.

### III. CONCLUSION

Summary judgment is granted in Blodgett's favor. Within thirty days, the parties must submit a form of order implementing this decision. The court believes that the next step in the litigation involves crafting a remedy for Fairstead's improper forfeiture of Blodgett's interests in non-pending deals. The parties must prepare a joint letter that either proposes a schedule for litigating the remedy or identifies other issues that must be addressed and proposes a schedule for litigating them as well.